IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 17, 2002

## STATE OF TENNESSEE v. JEFFERY WAYNE ROBERTSON

**Direct Appeal from the Circuit Court for Lawrence County
No. 19338     Jim T. Hamilton, Judge**

------------

**No. M2001-02131-CCA-R3-CD - Filed April 17, 2003**

------------

The defendant was found guilty of first degree premeditated murder by a Lawrence County jury and sentenced to life imprisonment. In his appeal, he argues that the evidence was insufficient to support the conviction, the trial court erred in allowing opinion testimony of a lay witness based on an experiment regarding the canning of green beans in a pressure cooker, and erred by allowing the statements of three witnesses to be read aloud by the witnesses to the jury and then become exhibits. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Hershell D. Koger, Pulaski, Tennessee (on appeal); Claudia S. Jack, District Public Defender; and Shipp R. Weems, Assistant District Public Defender (at trial), for the appellant, Jeffery Wayne Robertson.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; T. Michel Bottoms, District Attorney General; and Robert C. Sanders, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The victim, Carol Ann Patterson, was discovered dead in her Lawrence County home on Tuesday, July 16, 1996, a single gunshot wound to the face as the cause of death. Her former boyfriend, Jeffery Wayne Robertson, was tried and convicted of the murder.

Leon Jennings, a coworker of the defendant, testified to conversations that took place between the two about the victim in July of 1996. The defendant talked about the victim "quite a

lot" and said he was afraid that if he went to the victim's house and saw her there with someone else, "there might be a fight" and "he might hurt her." The victim would not allow the defendant to come to her home on Sundays or Mondays, and the defendant told Jennings that he suspected "maybe somebody else was coming over on . . . those days." Jennings suggested that, if he were the defendant, he would watch the victim's house.

Travis Paul Maples, II, testified that he was eighteen years old at the time of trial and had known the defendant from their working together at Carson Kelly's barn. He said that, about a month after the victim's death, he had asked the defendant "what he knew about the murder." The defendant "said that [the victim] was found sitting up with a book in her hand, and that he heard that she was shot with a .22 long rifle." Additionally, the defendant said "that there was no forced entry, and whoever had done it had to have gone out the back door; entered and exited the back door. The door furtherest from Waterloo Road."

On cross-examination, Maples said he had first told law enforcement authorities about these conversations with the defendant only a week before the trial. He said that he had been contacted by authorities and gave his statement as a result.

Sherry Sherrill, the victim's daughter, testified about an altercation that took place between the defendant and the victim on July 12, 1996, four days before her body was discovered. The victim and the defendant were arguing in the driveway when a man in a Volkswagen drove by and waved. The victim waved back, which prompted the defendant to inquire about the driver's identity and exclaim, "If I couldn't have you, nobody else would."

Spring Maldonado, a family friend, also witnessed the July 12 confrontation and testified that the defendant, who appeared to be drunk, told the victim "that if he found out that she was messing around with that guy that was driving that Volkswagen, that he would kill her." Then, addressing Maldonado and her sister, the defendant said he would kill them "if [he] f[ou]nd out that you whores [were] trying to get in between [him] and Carol."

Richard Eddings, who was dating Sherry Sherrill, also witnessed the defendant and victim's argument on July 12 and said that the defendant was "real upset" and was "yelling" and "fussing" with the victim. The defendant then invited Eddings to "go riding around with him," and Eddings related the conversation that occurred:

> [H]e asked me would him and her ever have a chance back together.
> And I said, well, if he quit his drinking, he probably would.
>
> And he got upset, saying, "Well, it ain't my drinking what [sic] caused us to breakup." And he got mad at me, 'cause I said that. And he said, "Well, ain't nobody gonna have her, if I can't have her."

Eddings testified that the defendant confronted him and Sherry[1] the next day at Houser's Grocery and demanded that they reveal the victim's whereabouts. When Sherry refused, the defendant grabbed her arm and raised his hand as if he were going to hit her and said, "You better tell me where she's at." Frightened, Sherry relented and told the defendant that her mother was at the swimming hole, to which he replied, "Does she have a boyfriend down there?" and "You and your mother's ass is grass." Eddings and Sherry found the victim, informed her of the incident, and returned home. Shortly thereafter, the defendant arrived and threatened to take the victim's children away and again questioned her about with whom she associated. According to Eddings, "[S]he told him it was her life, and who she was with down there was none of nobody's business." Eddings added that the defendant gave him the "ugliest look" because he suspected that the victim and Eddings "had something going on." The defendant told Eddings "that he better not catch [him] and her doing anything."

Stephen Sherrill, the victim's fifteen-year-old son, testified that the defendant dated his mother for "about a year-and-a-half" and that he lived with them for "about a year." He characterized his mother's relationship with the defendant as being "pretty good" before it "went for the worse."

Stephen testified that, on July 12, the defendant came to the house where he argued with the victim before leaving "in a rage." On July 13, he and the victim were driving home when the defendant "pulled in front of [them]," and another argument ensued in which he described the defendant as "very mad." During this roadside confrontation, the victim waved to a man driving a camouflaged Volkswagen "bug" and revving his motor. This display caused the defendant to demand the driver's identity and state, "If I couldn't have you, nobody else could."

On Sunday, July 14, the defendant invited Stephen to go swimming, and the two met at a cemetery according to plan. The defendant began talking about the victim as they left the cemetery, making such comments as "[h]er butt is grass" and "[t]hat bitch would be better off dead." Instead of swimming, they worked on a tractor and the defendant continuously asked Stephen who the man driving the Volkswagen was. Stephen eventually called his mother to pick him up and, upon her arrival, the following occurred:

> They got in an argument. And she said to get in the car. So I got in the car, and whenever I did, he reached in and grabbed the keys. So she got out, real mad, and said, "Let's go. We're going to walk."
>
> Well, he grabbed her by the arm and twisted it, and she started crying. After he let her go, we started walking again, and he threw the keys back to her.

---

[1]Because Sherry Sherrill and Stephen Sherrill share the same last name, we will refer to these witnesses by their first names. We intend no disrespect by this usage but do so to avoid continually utilizing their entire names.

When we got back in the van, he started going – he said he was going; for me to get in the back, so I did. We got up the road a little piece and he knocked the gear shift into neutral, and they argued a little bit more. And he asked who the man was that was in the Volkswagen, and she said that she didn't know. And he kept asking and asking, and she finally said, "His name is Robert. Now, let us go."

The two returned home, and Sherry Sherrill testified that the victim, as she arrived, was "crying and . . . shaking" and "that she had a red mark on her arm."[2] Sherry testified that, in the days before the murder, the defendant was jealous, possessive, and "kept getting more and more angry as the week had went on." Stephen also noticed that the situation was getting progressively worse: "[The defendant] got angry every night of the week, just about, because mom won't take him back. And their arguments would get worse and worse. And Sunday [the day before the day the victim was last seen alive] was the worse [sic] I ever seen."

Stephen testified that, between Monday and Wednesday of the week before his mother was killed, he and others had "shot all of the .22 ammunition," all of which had been manufactured by Winchester. He acknowledged on cross-examination that he had not searched the house to see if there was additional ammunition, but there was none left in the drawer where it was kept. On Thursday of that same week, the defendant had come to the victim's house "to get .270 shells to go hunting that day" and asked Stephen "[w]here all the bullets went." Stephen told the defendant that "we shot them all that week." Asked to review the owner's manual for a Marlin Model 70P "Papoose" semi-automatic .22 carbine, Stephen responded, "That was the break apart .22 that held seven rounds that was there when we shot all of the bullets to it and the single shot." He said that this rifle was at the house when they had fired all of the .22 bullets, but it later was missing.

Bobby Houser, the proprietor of Houser's Grocery, testified that the victim came to his store on Monday, July 15, at approximately 5:00 p.m. and purchased a Mountain Dew. She left in her car heading in the direction of her home, which was about a quarter of a mile away. Wade Durham testified that he was at Houser's Grocery around 5:00 p.m. that day and witnessed the victim make her purchase and chat with Houser before heading home. He said that he left a "minute or two" after the victim and arrived at his home, which was about a quarter of a mile away, at about 5:05 p.m.

The defendant's father, Eugene Robertson, testified on direct examination that his house was about three-quarters of a mile from the victim's house. According to his trial testimony, sometime between 5:00 and 5:30 p.m. on July 15, he saw the defendant walking home from the direction of the victim's house. He further testified that the defendant appeared "completely normal" and not nervous or agitated. During redirect examination by the State, Robertson was asked to identify a

---

[2] The Lawrence County Medical Examiner testified that the victim had a bruise on her right arm that occurred at some point within twenty-four hours of the shooting. Although the defendant apparently grabbed the victim's arm on Sunday, July 14, it is unclear from the transcript whether the incident occurred within twenty-four hours of the shooting.

written statement which he earlier had given to Tennessee Bureau of Investigation ("TBI") Agent Mike Cox, but, instead of simply reviewing the statement, he proceeded to read it aloud in its entirety without objection by the defense. According to the statement, Robertson had sat on his "porch until about 5:30 p.m." on July 15, and "[a]bout that time, [the defendant] came walking up to the house." On cross-examination by defense counsel, Robertson claimed he had told Agent Cox that the defendant had come to the porch "[b]etween 5:00 and 5:30," as he had testified in court, but he could not recall "exactly which."

Carson Kelly, the owner of Kelly's Dairy Farm, testified that the defendant, although scheduled to work, never came to the dairy farm on Monday, July 15. On cross-examination, Kelly said that it was possible the defendant had come to work on the 300-acre farm, and Kelly just had not seen him. However, on redirect examination, Kelly testified that he would daily instruct the defendant as to what work should be done and the defendant did not "normally" work without seeing him.

Bobby Houser testified that the defendant was in his store around 6:30 a.m. on Tuesday, July 16, to purchase cigarettes on his way to work at Kelly's Dairy Farm. Sherry Watson, an employee of Houser's Grocery, testified that the defendant twice came into the store later that day to buy beer. According to her testimony, the defendant was quieter than usual and said that he had learned over the weekend of the victim's new boyfriend.

Paramedic Larry Glass testified that he arrived at the victim's home on July 16 and entered through the kitchen door. He first observed a pressure cooker on the stove that "was really boiling." After turning off the stove, which he noticed was on high, he discovered the victim on the couch with "a little stuffed animal beside her." She had no "vital signs." He then called the county coroner and investigators.

Harwell McClusky, an officer with the Lawrence County Sheriff's Department at the time of the investigation, arrived at the victim's house on July 16 at about 10:20 a.m. and was the first member of law enforcement to arrive on the scene. As he entered the house, he checked to see that the stove was off because he could smell that something had been burning. He then located the victim's body, noticed that there was no weapon in sight, and secured the crime scene.

TBI Special Agent Wayne Wesson testified that he arrived at the murder scene on the morning that the victim's body was discovered. He entered the victim's kitchen through the back door and first observed a large pot of peeled tomatoes, a sink full of tomato peelings, a half-full bottle of Mountain Dew, and a pressure cooker on the stove that was later determined to contain seven jars of green beans that had been almost "boiled dry." Drippings from the boiling had developed on the top of the pressure cooker. On top of the refrigerator was a prescription medicine bottle with the defendant's name on the label.

Agent Wesson then entered the living room, where he saw the victim sitting on the couch with an opened book at her side, blood running down the side of her face, an empty Federal shell

casing in her lap and under her arm, and a purple stuffed animal that read "I love you" propped on her shoulder. Wesson testified that she had suffered a single gunshot wound to the face. He described the victim as "[n]ot really in a defensive – or running-type of position. Just sitting there." A shotgun and a Noble .22 rifle were found in a gun cabinet in the living room. It was later learned that a Papoose .22 rifle was missing from the house. Also recovered were a Federal shell casing, which had dust on it and "looked like it had been there a while," and two dud .22 rounds, both of which were on top of the gun cabinet, and thirteen shell casings, all of which were manufactured by Winchester, in the backyard. Agent Wesson explained the results of the investigation as to the recovered shell casings:

> The casing – the Federal casing found on top of the gun cabinet was consistent with the casings that were fired from the Noble rifle. It was fired from the Noble rifle, and the casing in [the victim's] lap was fired from the same rifle that fired the remaining casings in the back yard. That's the single. This is the one that was fired in her lap.

Wesson testified that ammunition recovered by an investigator from the home of the defendant's father was sent to the TBI Crime Lab for comparison with the slug removed from the victim. These cartridges, which were .22 caliber Federal ammunition, were of the "same type of casing" as that recovered under the victim's arm and were sent by the TBI to the Federal Bureau of Investigation ("FBI") Crime Lab for analysis. Additionally, he sent to the TBI Crime Lab the Noble .22 rifle from the victim's house and the Revelation .22 rifle from the defendant's residence. Special Agent Tommy Heflin, a TBI forensic scientist, testified that his tests showed that neither the Noble nor the Revelation rifle had fired the slug removed from the victim, but it was the "same type and design" of bullet that would have been housed in the .22 Federal shell casing found in the victim's lap.

Agent Wesson testified that he extensively searched the area around the victim's house to try and locate the missing weapon. It took twelve to fifteen minutes for him to walk the distance from the victim's house to that of the defendant's father where the defendant lived.

Agent Wesson was asked on direct examination whether he had done any additional investigation after taking the statement from Travis Paul Maples, who said he was told by the defendant that the victim "was found sitting up with a book in her hand," that there was "no forced entry," and that the assailant had to have "entered and exited the back door." Wesson replied:

> A. After receiving the statement from him, I reviewed the photographs to determine whether or not the book would have been visible – the book sitting beside [the victim] would be visible from the cased opening area. And also, I done some subsequent interviews.

-6-

Q.  All right, sir.  Did you review any newspaper articles concerning this case?

A.  Yes, sir, I did.

Q.  How many interviews – how many articles did you review?

A.  I don't know the exact number of articles, but with the help of Kim McGee at the D.A.'s Office, we acquired all of the articles from the local papers, including Columbia, that were published within a four-week period of this happening, and any other ones that they might have had during and around that time.

In those articles – I read each of those articles, and I found no information that would indicate to anyone that the book – what [the victim] was doing when she was killed.  There is no information in there that indicated that she was reading a book when she was killed.  And there was no information in there indicating where the assailant would have entered or exited the residence.

Another TBI forensic scientist, Special Agent Russell Davis, examined the gunshot residue kit that was taken from the defendant almost twenty-four hours after the murder.  The procedure used with a gunshot residue kit was to swab the suspect's palms in order to determine the presence of antimony, barium, and lead, the three elements resulting when a firearm is discharged.  He said that several factors could significantly affect the results of a gunshot residue analysis.  In this instance, the twenty-four hours between the shooting, the samples taken from the defendant, and the facts that the ammunition involved was .22 caliber and that the weapon fired was a rifle, lessened the potential for conclusive testing.  Davis explained that gunshot residue is "microscopic soot" on the skin's surface that disappears "the more you do with your hands," .22 caliber ammunition gives off less residue than other types of ammunition, and one's hands are not particularly close to where the residue is discharged when firing a rifle, as opposed to firing a handgun.  He said that antimony and lead, in levels indicative of gunshot residue, were found on the defendant's hands.  The results of his examination were "inconclusive," however, because the amount of barium, although present, was insufficient to indicate the presence of gunshot residue.

Agent Charles Peters, a physical scientist with the FBI laboratory in Washington, D.C., testified that he performs a "comparative bullet lead analysis" to determine whether a bullet taken from a victim is from the same source as other bullets taken from a suspect or a crime scene.  He said that the manufacturer of a bullet could not be determined by just an analysis of the bullet itself, but such a determination could be made by doing a "compositional analysis" on the bullet and comparing that with a particular box of cartridges.  He explained why different bullets would have the same composition:

Bullets from the same melt of lead will have the same composition. And that's an unique composition. So basically, what we have done is we had a bullet fragment. We didn't know where it came from. Now we can say it came from this one melt of lead at Federal, and was produced on or about the date that is marked on this box.

Now, we're not saying that – in that source of lead, a lot of bullets can be made. You know, just one box isn't made from a melt of lead. But other things that we also know about – the distribution and the use of ammunition – is that ammunition is basically bought up – particularly .22's – and shot in about two to three years after the ammunition is manufactured. Most of it has been shot up. And it no longer exists.

So you have this caldron of lead that was used to make all of these bullets from, which are in the tens of thousands of bullets that comes from one caldron of lead. You can imagine, if you have this bucket of lead, here, how many bullets could be made from it. But in a very short time, those are being manufactured and being shot up.

Agent Peters received a box containing "Federal, .22 long rifle, 40 grain, lead, round nosed" cartridges. According to the stamp placed by the manufacturer on the cartridge box, it had been filled "on 6/29/1983 at the Federal plant in Minnesota." Following his analyses, Agent Peters determined that the slug taken from the victim was "analytically indistinguishable" from the unfired cartridges taken from the defendant's house. He explained further that, by this conclusion, he meant that the slug removed from the victim's body and the unfired cartridges all had come from "one melt of lead at Federal, and was produced on or about the date that is marked on this box." As to the slug removed from the victim, he said, "We know it originated from this source and we know that the source in this case is a very old source, and there wouldn't be very many of these left around."

Agent Wesson testified that he interviewed the defendant on the evening of July 16. The defendant, who waived his Miranda rights in writing, gave a statement in which he said that he spent the night at the victim's house on Sunday, July 14, and left early the next morning. The victim told the defendant that night and again the next morning that she wanted him "out of her life." The defendant acknowledged that he knew of the victim's involvement with a man named Robert who drove a "dune buggy, or something like that" and that "he didn't like it, but he didn't have any problem with it." He denied that he ever threatened the victim, touched her in any harmful way, or killed her. Finally, he explained that when he left the victim's house he went to his parents' house where he "stayed all day long."

The victim's mother, Sheila Schroder, testified that she taught her daughter how to can green beans when she was twelve years old, and her daughter was following the same directions at the time of her last canning session. She shipped the victim's pressure cooker to Agent Wesson and provided

him with the same specific instructions for canning that the victim would have been following. The actual canned beans, which were not taken as evidence at the crime scene and had been sitting on Schroder's back porch for over a year, were also given to Wesson.

Agent Wesson testified that, following instructions which Sheila Schroder had given to the victim as to canning green beans, and using the victim's stove and pressure cooker, he left the cooker on the "high" setting on the stove for seventeen hours, the approximate period from when the victim was last seen alive at Houser's Grocery until her body was found. He testified that the pressure cooker remained intact, and the jars of beans within appeared like those in the cooker when the victim's body was discovered.

Dr. Charles Harlan, the Lawrence County Medical Examiner, performed the victim's autopsy at 4:30 p.m. on July 16. According to his testimony, the victim had been dead for twelve to twenty-four hours before the autopsy was performed, putting the victim's time of death sometime after 4:30 p.m. on Monday, July 15, but before 4:30 a.m. the following day.

Frances Marie Robertson, the defendant's mother, testified as the first defense witness that the defendant had been at her home as of 6:00 p.m. on Monday, July 15, and was asleep on her couch as of about 6:30 p.m. that evening. She said that during the evening, she had gotten up two or three times and, on each occasion, he was still sleeping. In her view, the defendant had a "pretty good relationship" with the victim. She said that Stephen Sherrill sometimes had taken some .22 cartridges from the box taken by the TBI during their investigation of the killing.

During cross-examination, Mrs. Robertson said that the defendant had spent Sunday night at the victim's house. As for what time he arrived back at her house on Monday, July 15, she replied that she "didn't pay no attention [to] what time he came home . . . I don't ever pay no attention to the clock." When questioned whether the defendant "stayed" at her house all day on Monday, she replied, "Well, he was in and out." She was unable to recall whether he had been at her house at 3:30 p.m. on Monday, July 15, saying that, because it was summer, she was keeping eight grandchildren at her house that day. She agreed that she had "probably" told a TBI agent, as her statement said, that "[m]y son, Jeffery Wayne Robertson, stayed at home that day probably at least 'til 3:30 P.M."

The defendant's brother, Glenn Robertson, testified that, because he had borrowed the defendant's truck to transport a cow, the defendant was without transportation from 4:30 p.m. to 6:30 p.m. on July 15.

Lisa Luna, the defendant's sister, testified that the victim and the defendant's father worked together and, when the victim did not arrive at work on July 16, he telephoned and asked her to check on the victim. Jennie Woodward, another of the defendant's sisters, lived next door to the victim. Sometime between 9:30 and 10:00 a.m. on Tuesday, July 16, the two sisters entered the victim's house through an unlocked door after their knocks went unanswered. They first heard the noise made by the pressure cooker, which was boiling on the stove. They then discovered the

victim's body on the couch and immediately left and called 9-1-1. During her cross-examination, Woodward read aloud, without objection by the defense, the statement which she had given to Deputy McClusky. The defense made an unsuccessful objection to this statement's being marked as an exhibit after the witness had finished reading it.

Following the testimony of Jennie Woodward, the defense rested. The defendant did not testify.

## ANALYSIS

The defendant raises three claims on appeal: (1) the trial court erred in allowing opinion testimony of a lay witness based on an experiment conducted by the witness; (2) the trial court erred in allowing the statements of three witnesses to be read to the jury and introduced as exhibits; and (3) the evidence was insufficient to support a conviction of first degree murder.

### I. Admissibility of Experimental Evidence

The defendant argues that the trial court erred in allowing TBI Agent Wesson to testify as to the out-of-court experiment he performed, utilizing the victim's stove and pressure cooker, because it was not performed in an "identical manner" to that which the victim would have used, and that it was used to establish the time of death "in an unsupported and unscientific manner, was not supported by the evidence and was prejudicial to the defendant." We will review these claims.

At trial, the defendant's sisters testified that it was the victim's normal practice to can in the morning. However, Wesson testified that Bobby Houser told him during the investigation that the victim had said, as she was shopping at Houser's Grocery the afternoon of Monday, July 15, that she was going home to can beans and the victim's work supervisor, as well, informed him that the victim had said she could not work overtime that evening because she was going home to can beans. Based on his interviews with Houser and Wade Durham, Wesson believed that the victim arrived home shortly after 5:00 p.m. When the victim's body was found roughly seventeen hours after she was seen at Houser's Grocery, the stove burner was on the highest setting and the pressure cooker on the burner was boiling.

Agent Wesson explained why he believed the ability of the victim's pressure cooker to withstand high heat for a long period was relevant:

> I had a question in my mind as to the stability of the cooker that was found at the scene. Based on the interview that I had conducted with Bobby Houser and Mr. Durham, I had some idea as to when [the victim] may have arrived home.

So to determine whether or not that cooker could withstand, assuming she had put the beans on when she got home, and they had been on the burner until we found them.

Wesson testified that he approached "individuals who were familiar with canning," such as "elderly folks," and asked them what would happen if a canner was left on a burner set at high for seventeen hours. To this inquiry, he received a "multitude of answers," including predicted meltdowns, explosions, and broken jars. The purpose of the experiment was to see if the pressure cooker could withstand being on a heated stove for seventeen hours, the length of the period between when the victim left Houser's Grocery on July 15 and her body was found on July 16.

Agent Wesson said that he obtained the pressure cooker from the victim's mother and "instructions from her to cook the beans, as she would have instructed [the victim] to do." Then, he "placed the cooker on the same stove, on the same eye. And using those instructions, [] cooked the beans for 17 hours and seven minutes." In the pressure cooker, he had placed "seven pint jars of beans in glass jars," the jars of the same size as those the victim had used. Wesson was asked to describe the results of his tests:

> Q.     And after 17 hours and seven minutes, what was the condition of the pressure cooker?
>
> A.     Well, from the outside – the exterior – it was representative of what I had found at the residence. It had steam burns on top of it. It was still intact. And I just turned it off and let it cool down. And when I opened the cooker, the beans were dry, just as they were at the residence.
>
> Q.     And did you do this experiment, again? Did you do it more than once?
>
> A.     Yes. I conducted a second experiment. The first time I conducted the experiment, I measured exactly the amount of water that was in the instructions. The second time I conducted the experiment, I guessed at the amount of water to put in the bottom of the pot. I'm speaking of – the jars would have been full of water, but the bottom of the cooking pot or the pressure cooker, a normal person wouldn't measure to determine how much water is in there. They would just, you know, guestimate two inches, or whatever you're going to put in there.
>
> Q.     In the first experiment, did you measure exactly?
>
> A.     Yes, I did.

-11-

Q.    What did you measure, exactly?

A.    Two inches.

Q.    Two inches of water.  And your second experiment, you just guesstimated it as anyone else would do?

A.    That's correct.

Q.    And what were the results of those two experiments?

A.    They were just about the same.  The beans were dry.  The pot was intact.  The bean jars were dry and the pot was dry.  The pot had the same burns on top of it.

Q.    And it had not melted down or blown up?

A.    No.

Q.    Why did you cook the beans for 17 hours and seven minutes?

A.    Based on the information I had received as to when [the victim] left Houser's Grocery, I used an estimate time she would have arrived home, and then added the time up until the time the ambulance service would have arrived, which would have been approximately 17 hours and seven minutes.

        After the victim's body had been discovered, the jars in the pressure cooker on her stove had been set out and allowed to cool, Wesson detailing their appearance:

A.    They accumulated some water in the bottom of the jars.

Q.    And did you measure that amount of water?

A.    Only by my sight, which it would have been about five-eighths of an inch, and some of them varied slightly, but about five-eighths of an inch of water in the bottom of the jar.

Q.    Okay.  And in your experiment, what were the results, there?

A.    My jars were dry, so I set them outside, as hers had set outside. And they accumulated water in the bottom of the jar, also.

-12-

Q.     Okay.  How much water did they accumulate?

A.     From a half – the first experiment had about a half-inch, and like I said, there was some variation.  And then, the second experiment had about three-quarters.

Q.     Were there equally variation in those, too?

A.     Yes.

On cross-examination, Agent Wesson said that, at the crime scene, he had opened the top of the pressure cooker but had not removed the jars of beans and did not know who did so.  He explained what had become of the pressure cooker and glass jars containing the beans between the time of the crime and his conducting the experiment:

When I called Mrs. Patterson to ask her where the beans and the cooker were, she said that they had set the beans in a box on the back porch and that the cooker had been taken with her.  So I retrieved the beans from the back porch, where they had been s[i]tting in the sun; hence the reason I set the beans that I cooked in the sun, also, for a short period of time to see if they would condensate as these did.

Agent Wesson then was questioned on cross-examination as to differing conditions between his experiment and those of the crime scene:

Q.     How much time elapsed from the time that the beans were taken out of the pressure cooker until you retrieved them from the box?

A.     Give me just a second, and I can be pretty precise on that. (Respite.)  I would have retrieved the beans from the back porch in August of 1997.  So they would have been s[i]tting there for a year.

Q.     Okay.  Now, on your experiment, did you allow your beans to s[i]t outside for a year?

A.     No, I did not.

Q.     So how can you compare the two, as far as condensation?

A.     The beans were sealed.  When a jar cools down, the beans will seal on the top of the lid.  Do you understand what I mean by that?

Q.     Yes, sir.

-13-

A.     Okay. Which should keep any additional moisture, unless the seal is broken, from entering the beans?

Q.     Well, let me ask you this question:  How many times did it rain over that year?

A.     I don't know.

Q.     How many heavy dews were there over that year?

A.     I don't know.

Wesson said that, as he was conducting the experiment, after thirteen or fourteen hours, the pressure cooker "had begun to stream some condensation away from the relief valve on top."

Wesson was not qualified as an expert in crime scene reconstruction or "pressure cooker physics," as the defendant contends that he should have been.  As the defendant correctly asserts, had the State sought to have Wesson testify as an expert, Tennessee Rule of Evidence 702 would have required the State to qualify him as such.[3]  When ruling on the admissibility of this testimony, however, the trial court concluded that certification as an expert was unnecessary, saying, "It's not the same as if it were some kind of scientific experiment to show ballistics or chemical compounds, or something of that nature.  I think it is something anyone could have done with proper instructions."

Rule 701(a), setting out the circumstances in which a non-expert witness, as Agent Wesson was relative to this experiment, may testify, provides:

> If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are
>
> (1) rationally based on the perception of the witness and
>
> (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Tenn. R. Evid. 701(a).

---

[3]Rule 702 states:  "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise."

In assessing the defendant's arguments, we first consider what the prosecution sought to show by testimony as to the out-of-court experiment utilizing the victim's pressure cooker. It was not intended to prove that the defendant killed the victim but, rather, that the time of death could have been shortly after 5:00 p.m. on Monday, July 15, the day before her body was discovered. Attempting to duplicate the same conditions when he found the pressure cooker on the stove following the discovery of the victim's body, Agent Wesson testified that, utilizing the victim's stove at the same setting, utilizing her pressure cooker, and the same size and number of jars within, he left the pot on the stove for seventeen hours to see if the "cooker could withstand" the temperature for seventeen hours, thus making viable the State's theory as to the time of the victim's death. Obviously, Agent Wesson could not duplicate exactly the conditions at the time the pressure cooker was placed on the stove. However, his assumptions were brought out during cross-examination.

With this view of the purpose of the experiment, we respectfully disagree with several of the characterizations used by the defendant in his analysis. First, we do not view the actions of Agent Wesson as being a "crime scene reconstruction." Rather, he performed the mechanical act of putting two inches of water into the victim's pressure cooker, placing it on the same burner of the stove as had the victim, turning the heat onto the highest setting, and then observing the pot for the next seventeen hours. We cannot conclude that such actions required expertise of any kind. As we view Agent Wesson's testimony in this regard, the opinion which he expressed only was that the victim's pressure cooker and contents appeared the same, after seventeen hours on the high setting, as it had when seen at the victim's residence following her murder. We respectfully disagree that, as the defendant argues, Agent Wesson testified as to the time of the victim's death.

It is clear that, subject to certain conditions, a trial court may allow a non-expert to testify as to out-of-court experiments. The general rule is explained in 29A Am. Jur. 2d *Evidence* § 998 (1994) (footnotes omitted):

> Evidence may be given of experiments, demonstrations, and tests made out of court and not in the presence of the jury upon the same principles which permit them to be conducted in the jury's presence. It is a matter peculiarly within the discretion of the court to decide the admissibility of such evidence in the light of all the surrounding facts and circumstances. The test for exclusion is whether the experiment would confuse rather than aid the jury.

The required relationship between the conditions of the experiment and those of the original occurrence is described in 29A Am. Jur. 2d *Evidence* § 1003 (1994) (footnotes omitted):

> One desiring to make an experiment or test in court or to introduce evidence of an experiment or test made out of court should first show that the experiment or test is to be made or was made, as the case may be, under conditions and circumstances similar to those prevailing at the time of the occurrence involved in the controversy;

otherwise, the courts will not, as a general rule, permit the making of the experiments or tests or the introduction of evidence. This is so because of the danger of misleading the members of the jury, who may attach exaggerated significance to the test[']s results. It is clear, however, that the conditions need not be identical with those existing at the time of the occurrence, but it is sufficient if there is a substantial similarity of conditions. Demonstrations of experiments used to merely illustrate the principles forming an expert opinion do not require strict adherence to the facts. Minor variations in the essential conditions go to the weight, rather than to the admissibility, of the evidence.

In Harwell v. Walton, 820 S.W.2d 116, 118 (Tenn. Ct. App. 1991), the court explained the function and use of experimental evidence:

Experimental evidence is generally admissible if it is relevant and probative. The probative value of the experiment can be ascertained by determining whether the experiment is identical or similar to the conditions of the litigated transaction. "Experiments made under proper test conditions are competent evidence, and are favorably received." 11 Tennessee Jurisprudence *Evidence*, § 84 (1984).

In Harwell, the court concluded that the trial court had erred in not allowing the plaintiff to testify that, subsequent to the accident which was the basis for the action, the plaintiff had visited the scene of the accident "in an effort to see what the maximum speed she could attain between Main Street and Third [S]treet was, and she tried to accelerate as fast as she could, and found the maximum speed she could attain was 26 miles an hour between Main and Second Street." Id. The court explained why this testimony should have been admitted:

The plaintiff simply wanted to testify that she could only obtain 26 miles an hour after accelerating as fast as she could between Main and Third Street. Her capability to do this or to operate this vehicle is not something that requires "scientific, technical, or other specialized knowledge. . . ." See T.R.E. 702. The plaintiff is not contending that her vehicle does not have the mechanical capabilities of going any faster. She is merely alleging that she, while driving at her normal capacity, could not go faster than 26 miles an hour. The fact that a lay witness conducted this experiment merely goes to the weight of the evidence, not its admissibility. We think the authority of Luckey v. Gowan, 46 Tenn. App. 392, 330 S.W.2d 45 (1959), Byers v. Nashville C. and St. L. Ry. Co., 94 Tenn. 345, 29 S.W. 128 (1985), and Fisher v. Travelers' Insurance Co., 124 Tenn. 450, 138

-16-

S.W. 316 (1911) supports the admissibility of this experimental evidence.

Id. at 118-19 (footnote omitted); see Luckey v. Gowan, 330 S.W.2d 45, 50 (Tenn. Ct. App. 1959) (testimony was admissible as to experiments performed at the scene of the accident by the defendant with an automobile of "only approximately the same size and weight as that driven" by plaintiff).

The admission of evidence is largely discretionary, and the trial court's discretion will not be disturbed on appeal unless there has been clear abuse. State v. Harris, 30 S.W.3d 345, 350 (Tenn. Crim. App. 1999). We conclude that the defendant's objections as to this experiment go to its weight but not its admissibility. Accordingly, the trial court did not abuse its discretion by allowing Agent Wesson to testify about his experiment.

## II. Admissibility of Witness Statements

The defendant presents, as his second issue on appeal, that the trial court erred in allowing Eugene Robertson, Jennie Woodward, and Leon Jennings to read their statements to the jury and, then, allowing the statements to be marked as exhibits.

Tennessee Rules of Evidence 612 and 613 establish the circumstances and procedures for refreshing the memory of a witness using a prior statement of the witness. Rule 612 explains the procedures when a witness uses a writing to refresh his or her memory:

> If a witness uses a writing while testifying to refresh memory for the purpose of testifying, an adverse party is entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains matters not related to the subject matter of the testimony, the court shall examine the writing in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of appeal. If a writing is not produced or delivered pursuant to order under this rule, the court shall make any order justice requires; in criminal cases when the prosecution elects not to comply, the order shall be one striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial.

The Advisory Commission Comment to this section explains the foundation necessary and procedure to be used when the memory of a witness is refreshed by a writing:

Only if a witness's memory requires refreshing should a writing be used by the witness. The direct examiner should lay a foundation for necessity, show the witness the writing, take back the writing, and ask the witness to testify from refreshed memory.

The use and admissibility of the prior statement of a witness is governed by Tennessee Rule of Evidence 613, which provides in pertinent part:

(a) Examining Witness Concerning Prior Statement. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.

(b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

Tennessee Rule of Evidence 803(5) explains the limited circumstances under which the prior statement may be entered as exhibit in a trial:

Recorded Recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

The Advisory Commission Comment to this subsection explains the showing which must be made before the prior statement of a witness may be used to refresh at trial the recollection of the witness:

The proposed rule recognizes the traditional Tennessee hearsay exception for past recollection recorded, but it expands common law in two respects. It allows the admissibility of the contents of a document reflecting past recollection recorded even though the witness has some recollection of the recorded facts but not enough to testify "fully and accurately." Second, it permits the witness to adopt

a record made by another not acting under the witness's supervision. The safeguard is the requirement of adoption at the time when the witness could vouch for the document's correctness.

Tenn. R. Evid. 803(5), Advisory Commission Cmt.

Having reviewed the applicable law, we now will consider the defendant's complaints as to the State's use of the prior statements of three of the trial witnesses. Leon Jennings, Eugene Robertson, and Jennie Woodward each made statements to the TBI during the investigation. At trial, each of these witnesses read aloud his or her statement, each statement then being marked as an exhibit. The defendant argues that the trial court erred both in allowing the statements to be read aloud and then becoming exhibits. We will review these claims separately, first considering whether it was error to allow each statement to be read in its entirety.

Leon Jennings, a coworker of the defendant, testifying as a witness for the State, was asked on direct examination about certain conversations he had with the defendant about the victim. Jennings testified, "That, I don't recall," when asked if the defendant had talked of the victim when he and the defendant were together the Friday and Saturday before the victim was killed. When asked if the defendant thought that the victim was seeing another man, Jennings responded, "I guess he did. I really can't remember." The State then sought to determine whether Jennings could identify a copy of a statement which he purportedly had given to TBI Agent Wesson:

> Q.    All right. Now, let me ask you, Mr. Jennings, if on or about July 25, 1996, you gave a statement to Special Agent Wayne Wesson in regard to your relationship with Jeff Robertson? Your conversation?
>
> A.    Yeah.
>
> Q.    And let me ask you to look at this statement and look it over and tell me if that's the essence of the statement that you gave to him?
>
> A.    What do you mean by that?
>
> Q.    Is that what you told Agent Wesson at that time?
>
> A.    About what part?
>
> Q.    All of it.
>
> A.    Do you want me to just read you what it says here?
>
> . . . .

Q.    Well, I want you to look it over and tell me if that's what you told Agent Wesson, at that time.

A.    Yeah.  It's pretty much.

Q.    Now, if you will, just read that statement into the record, sir.

[DEFENSE COUNSEL]:  Well, Your Honor, I'm going to have to object to him reading that into the record.  He said "pretty much," but he wants him to read the entire think [sic].  It either was the statement or it wasn't, or parts were or parts weren't.

THE COURT:  Is that what you told the Agent?

THE WITNESS:  This, right here, is not.  (Indicating.)  I think that's what he's talking about, right here.

THE COURT:  Let me see.

THE WITNESS:  (Handed.)

THE COURT:  Did you tell him these last two sentences?

THE WITNESS: Let's see.  Let me see it.

THE COURT:  (Handed.)

THE WITNESS:  Yeah.

THE COURT:  You told him that?  You told the Agent that?

THE WITNESS:  Yeah.

THE COURT: Is everything else in here what you told him?

THE WITNESS:  Yeah.  (Respite.)

THE COURT:  And everything in this statement is what you told Agent Wesson[?]

THE WITNESS:  As far as I remember it.

THE COURT:  All right.  I'm going to allow it.  Go ahead.

THE WITNESS:  It's been so long, I can't remember some of that stuff.

Jennings then proceeded to read aloud the statement:

"I work for Carson Kelly.  I milk cows at his farm.  Jeff Robinson [sic] works there, also.  He used to milk like I do.

I've known Jeff for the past four or five years.  I've been hanging out with him for the past couple of months.  He had some horses I broke for him.

On Friday, the twelfth of July, I went with him to a horse sale.  Saturday, we bought him a truck.

Jeff was all the time whining about Carol.  He was real possessive of Carol.  He didn't want other people around her.  You couldn't carry on a conversation with him without him talking about her."

I don't remember saying that, but it's what it says in here.

(Reading, continued:)  "He wanted to move back in.  She had kicked him out, and – he was pretty upset about it.  She still let him stay all night, sometimes, but he didn't live there any more.

About a month ago, he called me one day.  He said Carol had run him off.  He wanted to know if he could get a date with this girl who lived next to us, Jewel England.  Since then, they have gone out three or four times.  Horse sales, or something, but he never got his mind off Carol.

All the times Jeff has shown up at Carson's barn, I've never known him to walk.  It's a long walk from his mama's to Carson's.  He always drove or I give him a ride.

Jeff told me that Sherry, Carol's daughter, said that if Carol let Jeff come back, that she would leave.  He didn't like her or her friends.  He said several times that Sherry was a lot of their problems.

Since the death of Carol, Jeff has been real worried.  He's constantly saying, 'They are going to pin me with this murder.'  He keeps denying that he did it, but he's worried he's going to get stuck

-21-

with it.  He said he didn't think they would ever find anything – I think he's talking about a gun.  He said several times he didn't think they would find nothing.

Jeff also said that he knew that Monday, Carol had lunch with some guy at work.  I think his name was Charles or Robert.

One day after the murder, we were working and listening to the radio.  The radio said that the police had sent off a lot of evidence.  I looked at Jeff and said, 'They must have found some evidence.'  He said, 'Well, my fingerprints are all over everything in that house.'

A week or so before Carol got killed, Jeff said that Carol wouldn't let him come over on Sunday or Monday.  He said that she might be seeing someone on that day.

And I told him he should sneak over and watch the house to see if somebody – see who is coming over.  He told me that he was afraid to do that, because if he caught her with somebody, he might kill her.

I know that Jeff was a nice guy, but when he lost his temper, he went apeshits.  He and Carol had some bad arguments."

As the defendant concedes on appeal, portions of Jennings' written statement differed from his trial testimony.  In his statement, for example, he related that the defendant said he "might kill [the victim]" if he caught her with another man although, on direct examination, he testified that the defendant said he "might hurt her" if the same discovery were made.

It appears that the purpose of showing Jennings his prior statement was to determine the extent which he recalled making certain statements which the State believed to be helpful to its case. This procedure is explained in Neil P. Cohen et al., Tennessee Law of Evidence, § 6.12[2] (4th ed. 2000), Present Recollection Refreshed and Past Recollection Recorded:

Sometimes a witness's memory is "jogged" or revived if the witness reads a document or is otherwise reminded of an event.  The witness is then capable of testifying from memory.  The item used to revive the witness's memory becomes less important to the trial because the witness is testifying from present memory. This process, often called *present recollection revived or refreshed*, must be distinguished from *past recollection recorded*, where the witness cannot remember fully even after attempts to jog the witness's memory with a writing.  In the latter situation, the writing itself could

become admissible through the past recollection recorded hearsay exception.

Additionally, Tennessee Law of Evidence § 6.12[2] explains that "there is a thin line between present recollection revived and past recollection recorded." However, we cannot tell which, if either, was intended as to this witness, partly because we do not entirely understand Jennings' responses to questions about his statement to Agent Wesson. It appears that he implicitly identified the statement as that which he made to Wesson. Although it is apparent that the parties were reviewing various parts of the statements during the questioning of Jennings, we cannot determine from the transcript what, for instance, the witness was pointing to when he testified that he had not told Wesson "[t]his, right here." However, soon afterwards, saying "[a]s far as I remember," the witness seemed to agree that the statement accurately set out what he had told Agent Wesson. But the witness then said, "It's been so long, I can't remember some of that stuff."

It appears that the State particularly was interested in Jennings' statements that the defendant said, shortly before the murder, if he "caught [the victim] with somebody, he might kill her," and when the defendant "lost his temper, he went apeshits. He and [the victim] had some bad arguments." However, the State did not question Jennings as to whether he recalled making these two statements. Rather, relying on Jennings' comment that "[i]t's been so long, I can't remember some of the stuff," the State simply asked that the witness read his entire statement, which the witness then did over the defendant's objection. Jennings' somewhat confusing and contradictory responses to questions did not identify which portions he recalled and which he did not. Accordingly, the State failed to utilize the procedures either of present recollection revived or past recollection recorded. In fact, the State did not offer at trial an evidentiary theory for having Jennings read even a portion of the statement, much less the entire statement. Thus, we agree with the defendant that it was error to allow Jennings to read his statement to the jury. However, because much of the statement was duplicative of other testimony and it seems apparent that, had the State followed the required procedures, at least portions of the statement could have been utilized in one fashion or another, the error in allowing the statement to be read was harmless. As an additional consideration in our determination that this error was harmless, we note that, at the conclusion of the trial, the court instructed that prior inconsistent statements could be considered only for impeachment purposes:

> The witness may be impeached by proving that they have made material statements out of court which are at variance with their evidence on the witness stand. However, proof of such prior inconsistent statements may be considered by you only for the purpose of testing the witness' credibility, and not as substantive evidence of the truth of the matter asserted in such statements.

As to the statement of Eugene Robertson to TBI Agent Wesson, which the defendant argues the trial court also erred in allowing Robertson to read to the jury, we conclude that no error occurred because the witness read the statement without being asked to do so and the defendant did not object.

-23-

In fact, this statement came into evidence after the State first had asked Robertson to identify a copy of the statement and then asked only, "The statement has some – did you read over it, after he wrote it out?" Robertson responded by reading the entire statement to the jury, which, at the State's request, then was marked as an exhibit and, apparently, passed to the jury. At that point, the defense objected to the statement's becoming an exhibit because, as such, it could be reviewed by the jurors during their deliberations and, according to defense counsel, "if the jury forgets the testimony, [] they have simply got a rendition of the T.B.I's version of all of the statements." Accordingly, we conclude that the claimed error was waived because no timely objection was made. Tenn. R. App. P. 36(b). We reach the same conclusion as to the defendant's assignment as to Jennie Woodward's reading aloud her statement, for the reading was not objected to at trial or raised in the motion for new trial but presented for the first time on appeal. Further, since the defense did not object to Robertson or Woodward reading their respective statements, we conclude that the prior statements could be considered as substantive evidence, rather than just for impeachment purposes. As explained by our supreme court in State v. Smith, 24 S.W.3d 274, 280 (Tenn. 2000):

> When a party does not object to the admissibility of evidence, though, the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary, and the jury may consider that evidence for its "natural probative effects as if it were in law admissible." State v. Harrington, 627 S.W.2d 345, 348 (Tenn. 1981). If a prior inconsistent statement does not fall within a recognized exception to the hearsay rule, for example, it is certainly subject to objection as hearsay and limitation under the Rules of Evidence. Merely being subject to objection, however, does not mean that such evidence cannot be considered for its substantive value when no objection is raised.

As to the final part of this assignment, the defendant argues that it was error to make exhibits of the statements of Jennings, Robertson, and Woodward. With this argument, we agree. The State did not assert either at trial or on appeal any authority for these statements becoming exhibits, and we conclude that Tennessee Rule of Evidence 803(5) prohibited this from being done. However, we conclude that the error was harmless as to the statements, the jury having heard each read aloud, and the bulk of each statement being the same as the trial testimony of its maker.

### III. Sufficiency of the Evidence

The defendant argues that the evidence presented at trial was insufficient as a matter of law to convict him of first degree premeditated murder, asserting that the State did not produce any direct evidence to prove beyond a reasonable doubt that he shot the victim. He argues that a rational trier of fact could not have reached a guilty verdict based on the circumstantial evidence that made up the State's entire case against him.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002), our supreme court restated the holding of State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993), which in turn cited State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985), that "[a] conviction may be based entirely on circumstantial evidence where the facts are 'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'" We now will determine whether the evidence in this case was sufficient to support the defendant's conviction for first degree premeditated murder.

First degree murder is defined, in part, by Tennessee Code Annotated section 39-13-202(a)(1) as the "premeditated and intentional killing of another." Premeditation is "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d).

The presence of premeditation is a question of fact for the jury to determine based upon a consideration of all the evidence. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000), cert. denied, 531 U.S. 967, 121 S. Ct. 401, 148 L. Ed. 2d 310 (2000). Premeditation may be inferred from

circumstantial evidence surrounding the crime, including the manner and circumstances of the killing.  See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997).  There are several factors that tend to evidence premeditation:

> the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing.

State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

In this matter, the proof taken in the light most favorable to the State established that the defendant both had the opportunity to kill the victim and had made numerous statements just prior to the killing of his intent or willingness to do so.  The victim was killed during a period between late Monday afternoon and early Tuesday morning.  Leon Jennings testified that he had suggested the defendant watch the victim's house to find out if she was seeing another man on Sundays or Mondays, the days the defendant was not allowed to come by, the defendant telling him that "[h]e was afraid that if he seen somebody over [at the victim's house], he might hurt her."  Sherry Sherrill, the victim's daughter, testified that four days before the victim's body was discovered, the victim and the defendant argued; and, as a man in a Volkswagen waved at her mother, the defendant said, "If I couldn't have you, nobody else would."  Spring Maldonado, who witnessed the same argument, testified that the defendant, referring to the man driving the Volkswagen, told the victim if she was "messing around with" him, "he would kill her."  The defendant told Spring Maldonado and her sister that he would kill them as well "if [he] f[ou]nd out that you whores [were] trying to get in between [him] and [the victim]."  After that argument, the defendant became mad at Richard Eddings for saying that the victim and the defendant broke up because of his drinking and told Eddings, "Well, ain't nobody gonna have her, if I can't have her."  The following day, which was the day before the murder, the defendant confronted Jennings and Sherry Sherrill at Houser's Grocery, grabbing Sherrill and raising his hand as if to hit her after she refused to disclose the victim's whereabouts at that time.  Stephen Sherrill, the victim's son, said that, four days before the victim's body was found, the defendant had come to their house, argued with the victim, and left "in a rage."  The following day, as Sherrill was riding in a car with the victim, the defendant pulled his vehicle in front of theirs and was "very mad," telling the victim as a man passed by driving a Volkswagen, that if he "couldn't have [the victim], nobody else could."  The next day, which was the day before the victim was killed, the defendant told Stephen Sherrill, referring to the victim, "That bitch would be better off dead," and the defendant grabbed the victim, twisting her arm.  Thus, during the several day period before the victim was killed, the defendant made numerous threatening statements as to the circumstances under which he would kill the victim.

There was evidence of the defendant's opportunity to kill the victim.  She was last seen alive at approximately 5:00 p.m. on Monday, July 15, 1996, at Houser's Grocery where she purchased a Mountain Dew and left alone in her car, heading toward her house, which was about a quarter of a

mile away. A half-full bottle of Mountain Dew was found at the victim's house at the time her body was discovered. The defendant's father testified that his house was about three-quarters of a mile from that of the victim, and said first that the defendant arrived home on foot "about 5:30" p.m. that day, but said later that he had gotten home "between 5:00 and 5:30" that day. His statement to the TBI was that the defendant "came walking up to the house" about 5:30 p.m. Agent Wesson said that the defendant's residence was a twelve- to fifteen-minute walk from the victim's home.

Agent Wesson testified that his experiment with the victim's stove and pressure cooker showed that the pot could withstand being on the highest setting on the stove for at least seventeen hours, which was the longest period the victim could have been dead before her body was discovered.

The victim was killed by a .22 slug fired into her face. During the investigation, a Noble .22 rifle was taken from the victim's house, but a Papoose .22 rifle, which had been at the house several days earlier, was missing. A Revelation .22 rifle was taken from the house of the defendant's father and was sent, along with the Noble .22 from the victim's house, to the TBI Crime Lab for testing. Additionally, sent to the TBI Crime Lab were a .22 Federal spent hull found under the victim's left arm, thirteen .22 Winchester spent hulls recovered from the backyard of the victim, and a cartridge box packed on June 29, 1983, and originally containing fifty .22 Federal cartridges but then with only twenty cartridges, taken from the house of the defendant's father. FBI Scientist Charles Peters testified that the slug removed from the victim was "analytically indistinguishable" from the live rounds in a box of .22 cartridges, manufactured in Minnesota, found at the house of the defendant's father, where the defendant lived. Peters said that because of the passage of time since their manufacture, few of these cartridges would still be in existence. Of the thirteen spent hulls recovered from the victim's backyard, seven had been fired from the Revelation rifle recovered from the home of the defendant's father; and, the other six spent hulls, as well as the spent hull found under the left arm of the victim, had been fired from the same weapon, which was not either of the .22 rifles tested by the TBI Crime Lab.

There was no .22 ammunition at the victim's house as of the Wednesday before she was killed, and the defendant knew of this fact. Thus, the firearms evidence, in sum, showed that, while one .22 rifle was found at the victim's house and one was found at the defendant's, a .22 rifle was missing from the victim's house, although it had been there a few days earlier. There was no .22 ammunition at the victim's house when she was killed, which the defendant knew ahead of time because on Thursday, he had come to the house looking for ammunition. The spent .22 hull found in the victim's lap and a partial box of .22 cartridges taken from the house of the defendant's father had been manufactured by Federal. The cartridges from this box, which had been manufactured in 1982, and the slug removed from the victim were "analytically indistinguishable," meaning that they had come from the same melt of lead. Because of the passage of time, few of these bullets would still be found. The implication of this evidence is that the defendant, knowing there was no .22 ammunition at the victim's house, removed one or more shells from the box of Federal ammunition at his father's house, brought it with him to the victim's, and then loaded it into the Papoose rifle, which he used to kill the victim, disposing of the weapon before he returned home.

Based upon this evidence, a jury reasonably could conclude that the State had proven the defendant's motive for the homicide, that he suspected the victim was seeing another man and would rather have her dead than for this to occur; proven his willingness to kill her, from the numerous statements he made in the few days before her body was found that he intended to kill her; and of his opportunity, that he had time, during the period between when the victim left the grocery store and when he arrived at his father's house, a twelve- to fifteen-minute walk, to kill the victim and dispose of the weapon. The defendant's motive, intent, and opportunity in this matter are similar to those in State v. Robinson, 73 S.W.3d 136, 148 (Tenn. Crim. App. 2001), perm. to appeal denied (Tenn. 2002), where this court determined that the defendant's motive to kill his wife, an impending bankruptcy and divorce, his access to cyanide, and the unexplained way in which the poison entered his wife's body during a period when he was with her, were sufficient to establish by circumstantial evidence that he had murdered his wife. We, likewise, conclude that the evidence was sufficient in this case for a reasonable jury to conclude that the defendant shot and killed the victim.

Accordingly, viewing the evidence in the light most favorable to the prosecution, we conclude that the evidence, although circumstantial, was sufficient to allow a rational trier of fact to find beyond a reasonable doubt the essential elements of first degree premeditated murder.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.


_____
ALAN E. GLENN, JUDGE