# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 10, 2006 Session

## STATE OF TENNESSEE v. ARTIS WHITEHEAD

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-04835     Joseph B. Dailey, Judge**

---

**No. W2004-03058-CCA-R3-CD  - Filed May 10, 2006**

---

The defendant, Artis Whitehead, appeals his convictions and sentencing on five counts of especially aggravated kidnapping (Class A felony); two counts of aggravated assault (Class C felony); two counts of aggravated robbery (Class B felony); two counts of especially aggravated robbery (Class A felony); and one count of attempted aggravated robbery (Class C felony).  The consecutive sentences imposed totaled 249 years.

On appeal, the defendant presents the following issues:
1.  The evidence of identity was insufficient to support the conviction.
2.  A computer composite of the suspect was improperly admitted into evidence.
3.  The identification testimony of Ray Spence was improperly admitted.
4.  The defendant was prevented from effective cross-examination of Sergeant Howell.
5.  The defendant was improperly sentenced.

Having found no reversible error, we affirm the convictions and sentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and ALAN E. GLENN, JJ., joined.

William D. Massey and Lorna S. McClusky (on appeal), and Howard Wagerman (at trial), Memphis, Tennessee, for the appellant, Artis Whitehead.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich and Theresa McCusker, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

This case concerns a criminal incident at B.B. King's restaurant in Memphis on May 9, 2002. A man armed with a handgun entered the restaurant through a back entrance and eventually restrained several employees, as well as a produce delivery driver. The perpetrator took money and valuables from some employees and caused serious injuries to two of his captives. The only issue at trial was the identity of the perpetrator.

William G. Arnold was the restaurant's consultant and chef. On the morning of May 9, Mr. Arnold encountered a man in the basement hallway carrying a box from Office Depot. When Mr. Arnold confronted the individual regarding his purpose, the man drew a gun and ordered him into the office. When he attempted to disarm the gunman, Mr. Arnold was shot and sustained a head wound. Inside the office, the gunman ordered Mr. Arnold to open the restaurant safe. He did not know the combination and could not comply. The gunman then "hogtied" Mr. Arnold face down on the floor.

Lakina Pree, a purchasing agent, walked into the office. Mr. Arnold saw the gunman tie Ms. Pree and place his knee in the middle of her spine to push her down to the floor. Mr. Arnold stated that the produce delivery driver, James Johnson, then entered the office. The gunman instructed Mr. Johnson to get on the floor and to be quiet; he then bound him. The next individual to enter the office was Mark Hearn, a receiving agent. Mr. Hearn was also bound and placed on the floor.

Mr. Arnold stated that Christy Miller opened the office door, screamed, and then ran with the gunman in pursuit. While the gunman was out of the office, Mr. Arnold freed himself and armed himself with a broom stick. As the gunman reentered the office with Mrs. Miller, Mr. Arnold lunged at him which resulted in Mr. Arnold being shot in the hip and restrained again. The gunman restrained Mrs. Miller and attempted to force her to open the safe. She informed him that only Ray Spence, the general manager, had the combination. Mr. Arnold stated that the gunman took $500 from Mr. Arnold's wallet and then threw down the wallet. The gunman then took Mrs. Miller's jewelry. Mr. Arnold testified that he never got a good look at his assailant. At trial, he described him as a black male with facial hair and as "average." Later, Mr. Arnold was sent a photo array of suspects, but he was unable to make an identification. Mr. Arnold was hospitalized after the robbery but checked himself out after three to four hours. On cross-examination, Mr. Arnold stated that he had described the robber to police on May 14 as a black male, five feet eight, and one hundred and fifty pounds. He described the defendant, as he appeared in court, as "bulked out" and "muscular."

Ms. Lakina Pree, a receiving and purchasing agent, testified that she was taken captive in this incident. When Ms. Pree entered the office, she saw Mr. Arnold on the floor and bleeding. Ms. Pree identified the defendant in court as the perpetrator who had put a gun in her face. The defendant instructed her to get on the floor and, as she complied, the defendant kicked her down. The defendant threatened to kill Ms. Pree unless Mr. Arnold gave him the money from the restaurant.

Ms. Pree related that the produce delivery man came in, was tied, and was then placed on the floor. She stated that Mark Hearn was thrown into the office and that she heard Christy Miller being brought in by the defendant. The defendant tried to get Mrs. Miller to open the safe and was told that only Ray Spence had the combination. She saw Mr. Arnold attack the defendant and heard the gun discharge. Mr. Arnold was then thrown back to the floor. She heard the defendant searching through the office before he left. She stated that Mr. Arnold then got up and called 9-1-1. Ray Spence knocked at the office door and was admitted. Ms. Pree stated that she was hospitalized and was diagnosed with a broken vertebra. As a result, she had to wear a brace, have treatment by an orthopedic specialist, and undergo physical therapy. This therapy was continuing at the time of the trial. She testified that the defendant took a ring from her finger.

Ms. Pree viewed a photographic lineup on May 10, 2002, but did not identify any of the individuals pictured. On January 28, 2003, she was shown another photo array. At that time, she identified the defendant as the perpetrator. Prior to the jury trial, Ms. Pree made an in-court identification of the defendant, selecting him from seven or eight black males. She said she could not recall anything distinctive about the defendant's voice. On cross-examination, she stated she had never seen the defendant before the robbery. On the day after the robbery, she had given a description to police of the perpetrator as 5' 4" tall, 135-140 pounds, slim, with long features and a small mouth. Ms. Pree was insistent that the defendant was the robber but said that he appeared to have gained weight.

Mr. James Johnson was delivering produce to B.B. King's restaurant on May 9, 2002. He testified that, after the delivery, he was waiting for Mr. Arnold to return and pay for the produce. After approximately thirty or forty minutes, when Mr. Arnold had not returned, Mr. Johnson went to the office. Mr. Johnson was met at the office door by a man with a gun who commanded him to look down and not at him. The gunman told him where to lie down and proceeded to tie him with telephone cord. While faced down, Mr. Johnson heard another knock at the door, a woman's scream, and a gunshot. He then heard the woman brought into the office, protesting the taking of her ring. Mr. Johnson stated that he could not say what the robber looked like. Although the man did not take anything from him personally, Mr. Johnson stated that he feared for his life.

During cross-examination, Mr. Johnson stated that he felt the perpetrator was shorter than his own height of six feet. He stated that he had told investigators that the perpetrator was between 5' 6" and 5' 8", weighed about 150 pounds, was dark-skinned, and was wearing a cap. Mr. Johnson did not view any photo lineups.

Mrs. Christy Miller, the director of sales and marketing, testified as to her ensnarement by the robber. She was grabbed by the gunman as she approached the office door. She heard the gun discharge during Mr. Arnold's struggle with the gunman. The gunman ordered her to open the safe. Mrs. Miller told him that she could not but that the general manager could open the safe and would arrive soon. While tying her, the gunman took two rings and a watch from Mrs. Miller. The gunman also dumped the contents of her purse and complained that she only had twenty dollars. She stated that Mr. Arnold called 9-1-1 after the robber left. Mrs. Miller later viewed a photo spread but could

not make an identification. On cross-examination, she said that the robber was 5' 8" or 5' 9" and that he had a slim build. She said he was either wearing a wig or had long hair and was wearing some type of hat. She described the defendant in court as having a "stocky build" and as taller than she remembered the robber.

Mr. Workman was a civilian who worked as a composite artist for the Memphis Police Department. He testified that Mr. Mark Hearn was brought to him to supply a description for a composite construction. After discussion and selections of facial features of the suspect with Mr. Hearn, a computer composite sketch was created. Over the defendant's objection, the sketch was admitted into evidence.

Mr. Mark Hearn, who worked in shipping and receiving and performed kitchen duties at B.B. King's, was brought into the office at the same time as Christy Miller. The gunman had seen Mr. Hearn in the hallway and ordered him at gunpoint to enter. Mr. Hearn was placed on the floor and was bound by telephone cord. The robber took nothing from him. Mr. Hearn described the preparation of the composite sketch as done by Mr. Workman. Mr. Hearn used a book to select from various noses, lips, and chins; they were then placed in a single sketch. When asked if the end result looked like the robber, he stated, "It could be. That's the best I could get." Mr. Hearn described the robber as 5' 9" or 5' 10", not dark or light-skinned, and not a big guy. When asked if he could identify the defendant in court as the robber, he stated, "I'm not for sure." During cross-examination, Mr. Hearn stated that the defendant looked bigger than the robber.

Raymond Spence, Jr. was the general manager of B.B. King's. He testified that he was met outside the restaurant by a man who followed him inside and then pulled a gun. Mr. Spence identified the defendant in court as the gunman but said he appeared larger than on the day of the robbery. He stated that the defendant, while holding the gun and with one hand on Mr. Spence's shoulder, said, "Let's do this the right way" or words to that effect. The defendant wore a hat and either a wig or long hair. Although the defendant was wearing amber sunglasses, Mr. Spence said that, because the glasses were on the tip of the defendant's nose, he was able to observe the defendant's eyes as well as his facial features. Mr. Spence and the defendant started walking toward the main office downstairs. When the defendant became distracted looking out the back door, Mr. Spence ran to the office. There he found the individuals who had been held captive. Mr. Arnold was already calling police, and some individuals were still bound. The police arrived shortly thereafter. Mr. Spence explained the video surveillance which was in place at the restaurant. A video surveillance tape was introduced which, according to Mr. Spence, showed the defendant making his entrance into the rear of the restaurant. Another videotape was introduced from Memphis Light Gas and Water, located next door to the restaurant. Mr. Spence said this videotape showed the defendant walking in the restaurant vicinity earlier in the day carrying a box from Office Depot. A third tape introduced was a reproduction of the restaurant surveillance tape which slowed the images. All three tapes were viewed by the jury.

On May 11, 2002, Mr. Spence viewed two separate photo lineups presented by police personnel but did not make an identification of the perpetrator on either lineup. On February 1,

2003, Mr. Spence was shown another photo lineup and, on that occasion, he made a positive identification of the defendant. He also stated that he had made an in-court identification of the defendant in March of 2003. At that time he identified the defendant from among a group of five to eight black males.

On cross-examination, Mr. Spence testified that he had conversed face-to-face with the defendant outside the restaurant on the morning of the robbery. He said that he also had a good view of the defendant's face, both frontally and by profile, while in the restaurant. He described the robber as having a "unique face." Mr. Spence agreed that the defendant was bigger at trial than he remembered him and was taller than he had described to police. Despite these differences, Mr. Spence was adamant in his testimony that the defendant was the perpetrator.

Sergeant Joseph Pearlman worked at the robbery bureau of the Memphis Police Department. He testified that he showed Ms. Pree a photo lineup from which she identified the defendant as the robber.

Sergeant James Howell, with the Memphis Police Department, was the robbery case coordinator for this incident. During the investigation, Sergeant Howell had shown photo lineups to Mr. Ray Spence, Mr. William Arnold, and Mrs. Christy Miller. Sergeant Howell was present on February 1, 2003, when Mr. Spence identified the defendant in a photo lineup. Sergeant Howell stated that on January 31, 2005, he had participated in a consensual search of the defendant's girlfriend's apartment, where the defendant resided. No jewelry taken in the robbery was found during the search. Clothing items belonging to the defendant including boots, a flannel shirt, and some black hats were seized. On cross-examination, Sergeant Howell stated that during the course of the investigation, twenty to thirty suspects were considered. The defendant became a suspect in January 2003. Of the photo lineups containing the defendant, two of the four victims who viewed lineups identified the defendant.

The State rested, and after voir dire, the defendant elected not to testify in his defense.

Mr. Randy Nance worked as a janitor at B.B. King's on May 9, 2002. Mr. Nance stated that he saw the robber talking with the assistant manager on the morning of the robbery. He described the robber as dark, 5' 6" or 5' 7", weighing approximately 140 pounds, and wearing dark sunglasses. On cross-examination, Mr. Nance stated that the robber had a "low haircut" and was not wearing a head covering.

Ms. Vernita Irby testified that the defendant was formerly her fiance. She met the defendant in 2001. She stated that the defendant was bigger in 2001 due to weight lifting on a regular basis. She said the defendant had, during their acquaintance, kept his head shaven.

Ms. Juanita Irby, the mother of Vernita Irby, testified that the defendant was "great big" when she met him in 2001 and that his size had not changed.

Ms. Erma Glasper stated that her best friend was Juanita Irby. Ms. Glasper had known the defendant since 2001. Upon meeting the defendant, she asked him if he was a weight lifter. She said that the defendant's physique had not changed since she had met him.

## Sufficiency of Identification

The defendant contends that the identity evidence establishing the defendant as the perpetrator of the criminal acts was insufficient to support the convictions. When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e). The same standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The only fact at issue in the trial of this case was the identity of the defendant as the perpetrator of the crimes committed on May 9, 2002. The defendant accurately contends that only two of the victims were able to make positive identification of the defendant as the perpetrator. However, the determination of the weight and credibility of the witnesses and the reconciliation of conflicts in that testimony are matters entrusted exclusively to the trier of fact, and not this court. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). The credibility of eyewitness testimony identifying the defendant as the perpetrator of the charged offenses is a question of fact for jury determination upon consideration of all competent proof. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). In this case, Mr. Spence and Ms. Pree made positive identification of the defendant during separate photo lineups, again at the preliminary hearing, and at trial. The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the defendant under such circumstances as would permit a positive identification. Id. at 87-88. The testimony of Mr. Spence and Ms. Pree was not so improbable as to create a reasonable doubt as to their ability to make an identification. The jury weighed their testimony, together with the other proof, and accepted their identification testimony.

In addition, the jury had the benefit of viewing the composite sketch of the perpetrator as well as the videotapes. These images provided jurors a basis for comparison with the defendant that was

independent of the two identifying victims' identifications. This court may not reevaluate the evidence or substitute its inferences for those drawn by the jury from the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Accordingly, we conclude that the identification evidence was sufficient to support the convictions.

Composite Sketch of Perpetrator

The defendant next argues that the trial court erred in admitting a computer generated composite sketch of the perpetrator. The sketch was admitted over the defendant's objection after the testimony of Mr. Workman, the sketch artist for the Memphis Police Department. Mr. Workman testified that his compilation was the result of a conference with Mr. Mark Hearn, a victim witness. Mr. Workman explained how the composite was constructed based on the witness's selection of facial features. He stated that at the conclusion he asks the witness if the result is "in the ballpark." If affirmed, the sketch is submitted to the police. The next witness, Mr. Hearn, identified the sketch as that compiled by Mr. Workman based on Mr. Hearn's description. When asked if the sketch depicted the perpetrator, Mr. Hearn said, "It could be. That's the best I could get."

The defendant contends on appeal that the witness's authentication was insufficient due to its equivocation and also challenges the relevance of the sketch. Authentication is governed by Tennessee Rule of Evidence 901. The test for admissibility therein is whether there is sufficient evidence for the court to support a finding by the trier of fact that the item in question is what its proponent claims it to be. Tenn. R. Evid. 901(b)(1). While authentication is necessary, the item proposed for admission must also not be violative of other rules of evidence. The trial judge is the "arbiter of authentication issues," and his discretion will not be disturbed absent clear error. See Tenn. R. Evid. 901, Advisory Commission Cmts.; State v. Mickens, 123 S.W.3d 355, 376 (Tenn. Crim. App. 2003). "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

We conclude that the composite sketch was properly admitted based on the testimony of Mr. Hearn. Mr. Hearn identified the sketch as the product of his collaboration with the sketch artist as a reasonable likeness of the perpetrator. As a victim witness, his recall of the perpetrator's appearance satisfied the relevance requirement. After admission, the trier of fact was free to give as much or as little weight to the evidence as deemed appropriate.

Even if error, the introduction of the sketch was harmless. Mr. Hearn's lukewarm endorsement of the perpetrator's likeness and his inability to identify the defendant in court as the perpetrator served the defendant's interests in casting doubt on the central issue of identification. Tenn. R. Crim. P. 52(a).

## Testimony of Ray Spence

In his next issue, the defendant contends that the testimony of Mr. Ray Spence should have been excluded due to the prosecution's failure to preserve a written pretrial statement by Mr. Spence. Prior to the testimony of Mr. Spence, the defendant moved to exclude his identification testimony due to the State's failure to preserve his pretrial statement pursuant to Tennessee Rule of Criminal Procedure 26.2(a). The prosecutor stated that he did not believe the statement existed. The defendant's motion was denied, and Mr. Spence proceeded to testify. The next witness, Sergeant Howell, testified that he had taken a statement from Mr. Spence and that it had been lost.

When the State fails to preserve evidence which the defendant contends is exculpatory, the critical inquiry is whether a trial conducted without the lost or destroyed evidence would be fundamentally fair. State v. Ferguson, 2 S.W.3d 912, 914 (Tenn. 1999). In answering that query, it is first necessary to determine whether the State had a duty to preserve the evidence. Id. at 917. Upon a determination that a duty exists, then the following factors should guide the decision regarding the consequences of the breach:
1.  The degree of negligence involved;
2.  The significance of the destroyed evidence, considered in the light of the probative value and reliability of secondary or substitute evidence that remains available; and
3.  The sufficiency of the other evidence used at trial to support the conviction.

Id.

The nonexclusive remedies available to the trial judge to ensure a fundamentally fair trial range from dismissal to crafting orders to protect the defendant's rights, or a jury instruction. Id.

In the case at hand, we agree with the defendant that the State had a duty to preserve the pretrial statement although the exculpatory value of the statement is only speculative. The defendant conjectures that the statement would provide impeachment material to attack Mr. Spence's identification of the defendant. The defense was able to elicit an admission by Mr. Spence that he may have initially stated the perpetrator was shorter than his own height of five feet, eight inches. Mr. Spence also agreed that the defendant appeared "beefier" than the perpetrator.

We attribute the loss of the statement to simple negligence, and the defendant does not contend otherwise. Mr. Spence admitted possible discrepancies in his initial impressions but remained adamant that the defendant was the perpetrator. He remained consistent in his identification from the identification at the photo lineup through preliminary hearing and at trial. The other identifying witness, Ms. Pree, was likewise consistent. We also note that the defendant made no further motion for relief, such as an appropriate jury instruction, after Sgt. Howell's testimony revealed the status of the statement. See Tenn. R. App. P. 36(a). From our review of the record in light of the Ferguson factors, we conclude that the defendant did receive a fundamentally fair trial and that this issue is lacking in merit.

Cross-examination of Sergeant Howell

The defendant next contends that the trial court erred in barring the use of a memorandum prepared by Sgt. Howell in the defendant's cross-examination of Sgt. Howell. The document at issue was compiled by Sgt. Howell and was sent to uniformed patrol officers on May 17, 2002. The document, in pertinent part, read as follows:

> On May 9th, 2002 B.B. King's, 143 Beale was robbed and an employee was shot. Cash and jewelry was taken during the robbery. The suspect used the alley that runs, between Second and Third Street, behind B.B. Kings, prior to the robbery and most likely used this route to leave after the robbery.
>
> On May 13th, 2002 the suspect was seen on Beale Street again wearing the same clothing that he wore on the 9th except for the cap.
>
> He was wearing a gray work jacket, dark pants, blue and white Nike shoes and a white or cream colored plaid shirt. During the robbery, he wore a black ball cap. On the 13th he was wearing a red ball cap.
>
> Suspect is 5'6 to 5'8, thin build, dark complexion, mustache, 35 to 40 years of age. Was armed with a small, black, revolver, possible a .38 caliber. Two shots were fired on the scene.

During cross-examination, the defendant sought to question Sgt. Howell about the description of the suspect in the memorandum. The State interposed a hearsay objection to the memorandum and was sustained. However, the defendant was allowed to question Sgt. Howell as to the description of the perpetrator. The witness responded as follows:

| | |
|---|---|
| Sgt. Howell: | It depends on which witness or victim you would talk to. As with most robberies, every person's description is different - their perceptions of height, weight, complexion. In general, the generic description would have been a male black, 5/9 or so - 5/8 - that would have been about the middle of the road. You know, we had descriptions on both ends of five foot, so - |
| Defense Counsel: | What about weight-wise - what build? |
| Sgt. Howell: | Well, I mean weight was the same way - weights between different witnesses varied thirty/forty pounds. |

The defendant argues that had he been allowed to use the memorandum, he could have shown that the perpetrator was described as being from 5'6" to 5'8" and with a thin build. However, this would merely have been cumulative to the prior victim witnesses whose varying descriptions in their pretrial statements had already been exploited by the defendant's cross-examinations. We conclude that the refusal to allow impeachment through what was admittedly a "generic" description was not prejudicial in light of the cross-examinations of the individual victim witnesses. Absent clear abuse,

a trial court's discretion on the admission of evidence will not be disturbed.  State v. Robertson, 130 S.W.3d 842, 856 (Tenn. Crim. App. 2003).

Sentencing

The defendant's final two issues are challenges to sentencing as imposed by the trial judge. The defendant maintains that the trial court erred in the application of an enhancement factor and in the imposition of consecutive sentences.  Finally, the defendant contends that the sentencing was in violation of Blakely v. Washington, 524 U.S. 296 (2004). The defendant received sentences on each aggravated kidnapping conviction of thirty years as a multiple, violent 100% offender; on each aggravated assault, eight years as a multiple offender at 35%; on each aggravated robbery, fifteen years as a multiple offender at 35%; on each especially aggravated robbery, thirty years as a multiple, violent 100% offender; and on the attempted aggravated robbery, eight years as a multiple offender at 35%.  Count six, aggravated robbery, was merged with count seven, especially aggravated robbery.  All sentences were consecutive, totaling 249 years.

When a defendant challenges the length, range, or manner of service of a sentence, this court conducts a de novo review of the record with a presumption that the determinations made by the sentencing court are correct.  T.C.A. § 40-35-401(d) (1997).  If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after duly considering and weighing the factors and principles set out under the sentencing law, and its findings are adequately supported by the record, then we may not disturb the sentence even if we would have preferred a different result.  State v. Hooper, 29 S.W.3d 1, 5 (Tenn. 2000).  However, if the trial court failed to comply with the statutory guidelines, we must review the sentence de novo without a presumption of correctness.  State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

The defendant bears the burden of proving the sentence is improper.  See T.C.A. § 40-35-401, Sentencing Commission Comments.  To determine whether the defendant has carried this burden, this court considers: (a) the evidence adduced at trial and the sentence hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel as to sentencing alternatives; (e) the nature and characteristics of the offense; (f) the enhancement and mitigating factors; and (g) the defendant's potential or lack of potential for rehabilitation or treatment.  T.C.A. §§ 40-35-103(5), -210(b).

No testimony was submitted at the sentencing hearing.  The State introduced the presentence report and the certified copies of the defendant's federal conviction for murder for hire.  The parties agreed that the defendant qualified as a Range II, multiple offender.  The trial judge found three enhancement factors applicable:  the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; the felony resulted in death or bodily injury, and the defendant had previously been convicted of a felony that resulted in death or bodily injury; and the felony was committed while on a release from a prior felony conviction. T.C.A. §  40-35-114(9), (12), (14).

-10-

The trial judge then imposed sentences of thirty years for each of the seven A felony convictions; fifteen years for the two B felony convictions (one was merged); and eight years for each of the three C felony convictions. The trial judge found that consecutive sentencing was appropriate based on his findings that the defendant was a professional criminal; that he had an extensive record of criminal activity based on seven prior convictions; and that he was a dangerous offender. After the merger of counts six and seven, the total sentence imposed was 249 years.

The defendant argues that application of enhancement factor (9), a previous history of unwillingness to comply with conditions of release into the community, was inappropriate. We agree. Although the defendant was on release from a prior felony, there must be a previous history of unwillingness to comply rather than current offenses for which the defendant is being sentenced. State v. Hayes, 899 S.W.2d 175, 185-86 (Tenn. Crim. App. 1995). However, two enhancement factors remain. The defendant was sentenced to less than the midrange sentence on all the Class A felonies. The B felony convictions and C felony convictions were enhanced by three years and two years, respectively. We conclude that the sentences as imposed were properly supported by the record.

With regard to consecutive sentencing, a court may order consecutive sentences if it finds by a preponderance of the evidence that:
    (1) [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
    (2) [t]he defendant is an offender whose record of criminal activity is extensive;
    (3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
    (4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
    (5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
    (6) [t]he defendant is sentenced for an offense committed while on probation; or
    (7) [t]he defendant is sentenced for criminal contempt.
T.C.A. § 40-35-115(b); see also State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002). Furthermore, in the event the trial court finds that the defendant is a "dangerous offender," it must also determine whether the consecutive sentences (1) are reasonably related to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are

congruent with general principles of sentencing. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

The State, in its motion for consecutive sentencing, proposed four factors under Tennessee Code Annotated section 40-35-115(b) as applicable. Those factors were: the defendant is a professional criminal; the defendant's record of criminal activity is extensive; the defendant is a dangerous offender; and the present offenses were committed while the defendant was on probation. The trial judge indicated that the professional criminal factor was not a "major factor" in his determination of whether to impose consecutive sentencing. The trial judge characterized the defendant's record of criminal activity as being extensive, noting seven prior convictions for serious offenses. The offenses included: three drug-related convictions in 1991; attempted armed robbery in 1984; felony weapons offenses in 1984 and 1997; and a murder for hire in 1997. The defendant remained on supervised probation for the murder for hire federal conviction at the time of the current offenses.

The trial judge explicitly found that the defendant qualified as a dangerous offender. The trial judge recalled that the current offenses involved one victim being shot and another's back being seriously injured. The defendant's actions were described by the trial judge as "heinous," "cruel," "brutal," and indicative of little or no regard for human life. Implicit within these findings is the unarticulated conclusion that the public is deserving of future protection from this defendant and consecutive sentencing reasonably relates to the severity of the crimes committed. The trial judge also found that the defendant was on probation at the time the instant offenses were committed. We conclude that the record supports the trial judge's findings and the imposition of consecutive sentences.

The defendant, in his final sentencing issue, contends that Tennessee's sentencing procedure is violative of Blakely v. Washington, 542 U.S. 296 (2004). The defendant acknowledges that State v. Gomez, 163 S.W.2d 632, 661 (Tenn. 2005), has specifically held to the contrary but contends that the holding was erroneous. The defendant, in advocating such a position, cannot expect relief from this court, and we rely upon Gomez in concluding that this issue is without merit.

Conclusion

After a thorough review, we affirm the convictions and sentencing.

_____
JOHN EVERETT WILLIAMS, JUDGE