# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 16, 2014

## JEFFREY WAYNE ROBERTSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Lawrence County**
**No. 19338      Jim T. Hamilton, Judge**

---

**No. M2013-02023-CCA-R3-CO - Filed October 30, 2014**

---

The petitioner, Jeffery Wayne Robertson, was convicted in 1998 of first degree premeditated murder and sentenced to life imprisonment. His conviction was affirmed on direct appeal. State v. Robertson, 130 S.W.3d 842, 844 (Tenn. Crim. App. 2003). Subsequently, he filed a petition for post-conviction relief, one of the issues raised being that trial counsel was ineffective for not challenging "expert testimony about the results of a Comparative Bullet Lead Analysis ('CBLA') performed on evidence gathered by law enforcement." Jeffrey Wayne Robertson v. State, No. M2007-01378-CCA-R3-PC, 2009 WL 277073, at *9 (Tenn. Crim. App. Feb. 5, 2009), perm. app. denied (Tenn. June 15, 2009). Unsuccessful with that argument, he then raised a similar claim in a petition for writ of error coram nobis, the denial of which is the basis for this appeal. In that petition, he again focused on the CBLA evidence at his trial, pointing this time to the "newly discovered evidence" that the FBI "suspended performing 'bullet lead analysis' in 2004 and ceased entirely performing such examinations and providing such testimony in 2005." The coram nobis court denied the petition, concluding that the CBLA evidence issue had previously been argued and the only newly discovered evidence was the fact that the FBI was no longer using the test. Following our review of the record, we affirm the dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and NORMA MCGEE OGLE, J., joined.

Stanley K. Pierchoski, Pulaski, Tennessee, for the appellant, Jeffrey Wayne Robertson.

Robert E. Cooper, Jr., Attorney General and Reporter; Michelle L. Consiglio-Young, Assistant Attorney General; Mike Bottoms, District Attorney General; and Christi L. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

In the direct appeal of the petitioner's conviction, we set out the evidence in this matter:

> The victim, Carol Ann Patterson, was discovered dead in her Lawrence County home on Tuesday, July 16, 1996, a single gunshot wound to the face as the cause of death. Her former boyfriend, Jeffery Wayne Robertson, was tried and convicted of the murder.
>
> Leon Jennings, a coworker of the [petitioner], testified to conversations that took place between the two about the victim in July of 1996. The [petitioner] talked about the victim "quite a lot" and said he was afraid that if he went to the victim's house and saw her there with someone else, "there might be a fight" and "he might hurt her." The victim would not allow the [petitioner] to come to her home on Sundays or Mondays, and the [petitioner] told Jennings that he suspected "maybe somebody else was coming over on . . . those days." Jennings suggested that, if he were the [petitioner], he would watch the victim's house.
>
> Travis Paul Maples, II, testified that he was eighteen years old at the time of trial and had known the [petitioner] from their working together at Carson Kelly's barn. He said that, about a month after the victim's death, he had asked the [petitioner] "what he knew about the murder." The [petitioner] "said that [the victim] was found sitting up with a book in her hand, and that he heard that she was shot with a .22 long rifle." Additionally, the [petitioner] said "that there was no forced entry, and whoever had done it had to have gone out the back door; entered and exited the back door. The door furtherest from Waterloo Road."
>
> On cross-examination, Maples said he had first told law enforcement authorities about these conversations with the [petitioner] only a week before the trial. He said that he had been contacted by authorities and gave his statement as a result.
>
> Sherry Sherrill, the victim's daughter, testified about an altercation that took place between the [petitioner] and the victim on July 12, 1996, four days before her body was discovered. The victim and the [petitioner] were arguing

-2-

in the driveway when a man in a Volkswagen drove by and waved. The victim waved back, which prompted the [petitioner] to inquire about the driver's identity and exclaim, "If I couldn't have you, nobody else would."

Spring Maldonado, a family friend, also witnessed the July 12 confrontation and testified that the [petitioner], who appeared to be drunk, told the victim "that if he found out that she was messing around with that guy that was driving that Volkswagen, that he would kill her." Then, addressing Maldonado and her sister, the [petitioner] said he would kill them "if [he] f[ou]nd out that you whores [were] trying to get in between [him] and Carol."

Richard Eddings, who was dating Sherry Sherrill, also witnessed the [petitioner] and victim's argument on July 12 and said that the [petitioner] was "real upset" and was "yelling" and "fussing" with the victim. The [petitioner] then invited Eddings to "go riding around with him," and Eddings related the conversation that occurred:

> [H]e asked me would him and her ever have a chance back together. And I said, well, if he quit his drinking, he probably would.
>
> And he got upset, saying, "Well, it ain't my drinking what [sic] caused us to breakup." And he got mad at me, 'cause I said that. And he said, "Well, ain't nobody gonna have her, if I can't have her."

Eddings testified that the [petitioner] confronted him and Sherry the next day at Houser's Grocery and demanded that they reveal the victim's whereabouts. When Sherry refused, the [petitioner] grabbed her arm and raised his hand as if he were going to hit her and said, "You better tell me where she's at." Frightened, Sherry relented and told the [petitioner] that her mother was at the swimming hole, to which he replied, "Does she have a boyfriend down there?" and "You and your mother's ass is grass." Eddings and Sherry found the victim, informed her of the incident, and returned home. Shortly thereafter, the [petitioner] arrived and threatened to take the victim's children away and again questioned her about with whom she associated. According to Eddings, "[S]he told him it was her life, and who she was with down there was none of nobody's business." Eddings added that the [petitioner] gave him the "ugliest look" because he suspected that the victim and Eddings "had something going on." The [petitioner] told Eddings "that he

-3-

better not catch [him] and her doing anything."

Stephen Sherrill, the victim's fifteen-year-old son, testified that the [petitioner] dated his mother for "about a year-and-a-half" and that he lived with them for "about a year." He characterized his mother's relationship with the [petitioner] as being "pretty good" before it "went for the worse."

Stephen testified that, on July 12, the [petitioner] came to the house where he argued with the victim before leaving "in a rage." On July 13, he and the victim were driving home when the [petitioner] "pulled in front of [them]," and another argument ensued in which he described the [petitioner] as "very mad." During this roadside confrontation, the victim waved to a man driving a camouflaged Volkswagen "bug" and revving his motor. This display caused the [petitioner] to demand the driver's identity and state, "If I couldn't have you, nobody else could."

On Sunday, July 14, the [petitioner] invited Stephen to go swimming, and the two met at a cemetery according to plan. The [petitioner] began talking about the victim as they left the cemetery, making such comments as "[h]er butt is grass" and "[t]hat bitch would be better off dead." Instead of swimming, they worked on a tractor and the [petitioner] continuously asked Stephen who the man driving the Volkswagen was. Stephen eventually called his mother to pick him up and, upon her arrival, the following occurred:

They got in an argument. And she said to get in the car. So I got in the car, and whenever I did, he reached in and grabbed the keys. So she got out, real mad, and said, "Let's go. We're going to walk."

Well, he grabbed her by the arm and twisted it, and she started crying. After he let her go, we started walking again, and he threw the keys back to her.

When we got back in the van, he started going – he said he was going; for me to get in the back, so I did. We got up the road a little piece and he knocked the gear shift into neutral, and they argued a little bit more. And he asked who the man was that was in the Volkswagen, and she said that she didn't know. And he kept asking and asking, and she finally said, "His name is Robert. Now, let us go."

-4-

The two returned home, and Sherry Sherrill testified that the victim, as she arrived, was "crying and . . . shaking" and "that she had a red mark on her arm." Sherry testified that, in the days before the murder, the [petitioner] was jealous, possessive, and "kept getting more and more angry as the week had went on." Stephen also noticed that the situation was getting progressively worse: "[The petitioner] got angry every night of the week, just about, because mom won't take him back. And their arguments would get worse and worse. And Sunday [the day before the day the victim was last seen alive] was the worse [sic] I ever seen."

Stephen testified that, between Monday and Wednesday of the week before his mother was killed, he and others had "shot all of the .22 ammunition," all of which had been manufactured by Winchester. He acknowledged on cross-examination that he had not searched the house to see if there was additional ammunition, but there was none left in the drawer where it was kept. On Thursday of that same week, the [petitioner] had come to the victim's house "to get .270 shells to go hunting that day" and asked Stephen "[w]here all the bullets went." Stephen told the [petitioner] that "we shot them all that week." Asked to review the owner's manual for a Marlin Model 70P "Papoose" semi-automatic .22 carbine, Stephen responded, "That was the break apart .22 that held seven rounds that was there when we shot all of the bullets to it and the single shot." He said that this rifle was at the house when they had fired all of the .22 bullets, but it later was missing.

Bobby Houser, the proprietor of Houser's Grocery, testified that the victim came to his store on Monday, July 15, at approximately 5:00 p.m. and purchased a Mountain Dew. She left in her car heading in the direction of her home, which was about a quarter of a mile away. Wade Durham testified that he was at Houser's Grocery around 5:00 p.m. that day and witnessed the victim make her purchase and chat with Houser before heading home. He said that he left a "minute or two" after the victim and arrived at his home, which was about a quarter of a mile away, at about 5:05 p.m.

The [petitioner's] father, Eugene Robertson, testified on direct examination that his house was about three-quarters of a mile from the victim's house. According to his trial testimony, sometime between 5:00 and 5:30 p.m. on July 15, he saw the [petitioner] walking home from the direction of the victim's house. He further testified that the [petitioner] appeared "completely normal" and not nervous or agitated. During redirect examination by the State, Robertson was asked to identify a written statement which he earlier had given

to Tennessee Bureau of Investigation ("TBI") Agent Mike Cox, but, instead of simply reviewing the statement, he proceeded to read it aloud in its entirety without objection by the defense. According to the statement, Robertson had sat on his "porch until about 5:30 p.m." on July 15, and "[a]bout that time, [the [petitioner] came walking up to the house." On cross-examination by defense counsel, Robertson claimed he had told Agent Cox that the [petitioner] had come to the porch "[b]etween 5:00 and 5:30," as he had testified in court, but he could not recall "exactly which."

Carson Kelly, the owner of Kelly's Dairy Farm, testified that the [petitioner], although scheduled to work, never came to the dairy farm on Monday, July 15. On cross-examination, Kelly said that it was possible the [petitioner] had come to work on the 300-acre farm, and Kelly just had not seen him. However, on redirect examination, Kelly testified that he would daily instruct the [petitioner] as to what work should be done and the [petitioner] did not "normally" work without seeing him.

Bobby Houser testified that the [petitioner] was in his store around 6:30 a.m. on Tuesday, July 16, to purchase cigarettes on his way to work at Kelly's Dairy Farm. Sherry Watson, an employee of Houser's Grocery, testified that the [petitioner] twice came into the store later that day to buy beer. According to her testimony, the [petitioner] was quieter than usual and said that he had learned over the weekend of the victim's new boyfriend.

Paramedic Larry Glass testified that he arrived at the victim's home on July 16 and entered through the kitchen door. He first observed a pressure cooker on the stove that "was really boiling." After turning off the stove, which he noticed was on high, he discovered the victim on the couch with "a little stuffed animal beside her." She had no "vital signs." He then called the county coroner and investigators.

Harwell McClusky, an officer with the Lawrence County Sheriff's Department at the time of the investigation, arrived at the victim's house on July 16 at about 10:20 a.m. and was the first member of law enforcement to arrive on the scene. As he entered the house, he checked to see that the stove was off because he could smell that something had been burning. He then located the victim's body, noticed that there was no weapon in sight, and secured the crime scene.

TBI Special Agent Wayne Wesson testified that he arrived at the murder

scene on the morning that the victim's body was discovered. He entered the victim's kitchen through the back door and first observed a large pot of peeled tomatoes, a sink full of tomato peelings, a half-full bottle of Mountain Dew, and a pressure cooker on the stove that was later determined to contain seven jars of green beans that had been almost "boiled dry." Drippings from the boiling had developed on the top of the pressure cooker. On top of the refrigerator was a prescription medicine bottle with the [petitioner's] name on the label.

Agent Wesson then entered the living room, where he saw the victim sitting on the couch with an opened book at her side, blood running down the side of her face, an empty Federal shell casing in her lap and under her arm, and a purple stuffed animal that read "I love you" propped on her shoulder. Wesson testified that she had suffered a single gunshot wound to the face. He described the victim as "[n]ot really in a defensive – or running-type of position. Just sitting there." A shotgun and a Noble .22 rifle were found in a gun cabinet in the living room. It was later learned that a Papoose .22 rifle was missing from the house. Also recovered were a Federal shell casing, which had dust on it and "looked like it had been there a while," and two dud .22 rounds, both of which were on top of the gun cabinet, and thirteen shell casings, all of which were manufactured by Winchester, in the backyard. Agent Wesson explained the results of the investigation as to the recovered shell casings:

> The casing – the Federal casing found on top of the gun cabinet was consistent with the casings that were fired from the Noble rifle. It was fired from the Noble rifle, and the casing in [the victim's] lap was fired from the same rifle that fired the remaining casings in the back yard. That's the single. This is the one that was fired in her lap.

Wesson testified that ammunition recovered by an investigator from the home of the [petitioner's] father was sent to the TBI Crime Lab for comparison with the slug removed from the victim. These cartridges, which were .22 caliber Federal ammunition, were of the "same type of casing" as that recovered under the victim's arm and were sent by the TBI to the Federal Bureau of Investigation ("FBI") Crime Lab for analysis. Additionally, he sent to the TBI Crime Lab the Noble .22 rifle from the victim's house and the Revelation .22 rifle from the [petitioner's] residence. Special Agent Tommy Heflin, a TBI forensic scientist, testified that his tests showed that neither the

Noble nor the Revelation rifle had fired the slug removed from the victim, but it was the "same type and design" of bullet that would have been housed in the .22 Federal shell casing found in the victim's lap.

Agent Wesson testified that he extensively searched the area around the victim's house to try and locate the missing weapon. It took twelve to fifteen minutes for him to walk the distance from the victim's house to that of the [petitioner's] father where the [petitioner] lived.

Agent Wesson was asked on direct examination whether he had done any additional investigation after taking the statement from Travis Paul Maples, who said he was told by the [petitioner] that the victim "was found sitting up with a book in her hand," that there was "no forced entry," and that the assailant had to have "entered and exited the back door." Wesson replied:

> A. After receiving the statement from him, I reviewed the photographs to determine whether or not the book would have been visible – the book sitting beside [the victim] would be visible from the cased opening area. And also, I done some subsequent interviews.
>
> Q. All right, sir. Did you review any newspaper articles concerning this case?
>
> A. Yes, sir, I did.
>
> Q. How many interviews – how many articles did you review?
>
> A. I don't know the exact number of articles, but with the help of Kim McGee at the D.A.'s Office, we acquired all of the articles from the local papers, including Columbia, that were published within a four-week period of this happening, and any other ones that they might have had during and around that time.
>
> In those articles – I read each of those articles, and I found no information that would indicate to anyone that the book – what [the victim] was doing when she was killed. There is no information in there that indicated that she was reading a book when she was killed. And there was no information in there indicating where the assailant would have entered or exited

-8-

the residence.

Another TBI forensic scientist, Special Agent Russell Davis, examined the gunshot residue kit that was taken from the [petitioner] almost twenty-four hours after the murder.  The procedure used with a gunshot residue kit was to swab the suspect's palms in order to determine the presence of antimony, barium, and lead, the three elements resulting when a firearm is discharged.  He said that several factors could significantly affect the results of a gunshot residue analysis.  In this instance, the twenty-four hours between the shooting, the samples taken from the [petitioner], and the facts that the ammunition involved was .22 caliber and that the weapon fired was a rifle, lessened the potential for conclusive testing.  Davis explained that gunshot residue is "microscopic soot" on the skin's surface that disappears "the more you do with your hands," .22 caliber ammunition gives off less residue than other types of ammunition, and one's hands are not particularly close to where the residue is discharged when firing a rifle, as opposed to firing a handgun.  He said that antimony and lead, in levels indicative of gunshot residue, were found on the [petitioner's] hands.  The results of his examination were "inconclusive," however, because the amount of barium, although present, was insufficient to indicate the presence of gunshot residue.

Agent Charles Peters, a physical scientist with the FBI laboratory in Washington, D.C., testified that he performs a "comparative bullet lead analysis" to determine whether a bullet taken from a victim is from the same source as other bullets taken from a suspect or a crime scene.  He said that the manufacturer of a bullet could not be determined by just an analysis of the bullet itself, but such a determination could be made by doing a "compositional analysis" on the bullet and comparing that with a particular box of cartridges.  He explained why different bullets would have the same composition:

> Bullets from the same melt of lead will have the same composition.  And that's an unique composition.  So basically, what we have done is we had a bullet fragment.  We didn't know where it came from.  Now we can say it came from this one melt of lead at Federal, and was produced on or about the date that is marked on this box.
>
> Now, we're not saying that – in that source of lead, a lot of bullets can be made.  You know, just one box isn't made from a melt of lead.  But other things that we also know about--the

distribution and the use of ammunition – is that ammunition is basically bought up – particularly .22's – and shot in about two to three years after the ammunition is manufactured. Most of it has been shot up. And it no longer exists.

So you have this caldron of lead that was used to make all of these bullets from, which are in the tens of thousands of bullets that comes from one caldron of lead. You can imagine, if you have this bucket of lead, here, how many bullets could be made from it. But in a very short time, those are being manufactured and being shot up.

Agent Peters received a box containing "Federal, .22 long rifle, 40 grain, lead, round nosed" cartridges. According to the stamp placed by the manufacturer on the cartridge box, it had been filled "on 6/29/1983 at the Federal plant in Minnesota." Following his analyses, Agent Peters determined that the slug taken from the victim was "analytically indistinguishable" from the unfired cartridges taken from the [petitioner's] house. He explained further that, by this conclusion, he meant that the slug removed from the victim's body and the unfired cartridges all had come from "one melt of lead at Federal, and was produced on or about the date that is marked on this box." As to the slug removed from the victim, he said, "We know it originated from this source and we know that the source in this case is a very old source, and there wouldn't be very many of these left around."

Agent Wesson testified that he interviewed the [petitioner] on the evening of July 16. The [petitioner], who waived his <u>Miranda</u> rights in writing, gave a statement in which he said that he spent the night at the victim's house on Sunday, July 14, and left early the next morning. The victim told the [petitioner] that night and again the next morning that she wanted him "out of her life." The [petitioner] acknowledged that he knew of the victim's involvement with a man named Robert who drove a "dune buggy, or something like that" and that "he didn't like it, but he didn't have any problem with it." He denied that he ever threatened the victim, touched her in any harmful way, or killed her. Finally, he explained that when he left the victim's house he went to his parents' house where he "stayed all day long."

The victim's mother, Sheila Schroder, testified that she taught her daughter how to can green beans when she was twelve years old, and her daughter was following the same directions at the time of her last canning

session. She shipped the victim's pressure cooker to Agent Wesson and provided him with the same specific instructions for canning that the victim would have been following. The actual canned beans, which were not taken as evidence at the crime scene and had been sitting on Schroder's back porch for over a year, were also given to Wesson.

Agent Wesson testified that, following instructions which Sheila Schroder had given to the victim as to canning green beans, and using the victim's stove and pressure cooker, he left the cooker on the "high" setting on the stove for seventeen hours, the approximate period from when the victim was last seen alive at Houser's Grocery until her body was found. He testified that the pressure cooker remained intact, and the jars of beans within appeared like those in the cooker when the victim's body was discovered.

Dr. Charles Harlan, the Lawrence County Medical Examiner, performed the victim's autopsy at 4:30 p.m. on July 16. According to his testimony, the victim had been dead for twelve to twenty-four hours before the autopsy was performed, putting the victim's time of death sometime after 4:30 p.m. on Monday, July 15, but before 4:30 a.m. the following day.

Frances Marie Robertson, the [petitioner's] mother, testified as the first defense witness that the [petitioner] had been at her home as of 6:00 p.m. on Monday, July 15, and was asleep on her couch as of about 6:30 p.m. that evening. She said that during the evening, she had gotten up two or three times and, on each occasion, he was still sleeping. In her view, the [petitioner] had a "pretty good relationship" with the victim. She said that Stephen Sherrill sometimes had taken some .22 cartridges from the box taken by the TBI during their investigation of the killing.

During cross-examination, Mrs. Robertson said that the [petitioner] had spent Sunday night at the victim's house. As for what time he arrived back at her house on Monday, July 15, she replied that she "didn't pay no attention [to] what time he came home . . . I don't ever pay no attention to the clock." When questioned whether the [petitioner] "stayed" at her house all day on Monday, she replied, "Well, he was in and out." She was unable to recall whether he had been at her house at 3:30 p.m. on Monday, July 15, saying that, because it was summer, she was keeping eight grandchildren at her house that day. She agreed that she had "probably" told a TBI agent, as her statement said, that "[m]y son, Jeffery Wayne Robertson, stayed at home that day probably at least 'til 3:30 P.M."

The [petitioner's] brother, Glenn Robertson, testified that, because he had borrowed the [petitioner's] truck to transport a cow, the [petitioner] was without transportation from 4:30 p.m. to 6:30 p.m. on July 15.

Lisa Luna, the [petitioner's] sister, testified that the victim and the [petitioner's] father worked together and, when the victim did not arrive at work on July 16, he telephoned and asked her to check on the victim. Jennie Woodward, another of the [petitioner's] sisters, lived next door to the victim. Sometime between 9:30 and 10:00 a.m. on Tuesday, July 16, the two sisters entered the victim's house through an unlocked door after their knocks went unanswered. They first heard the noise made by the pressure cooker, which was boiling on the stove. They then discovered the victim's body on the couch and immediately left and called 9-1-1. During her cross-examination, Woodward read aloud, without objection by the defense, the statement which she had given to Deputy McClusky. The defense made an unsuccessful objection to this statement's being marked as an exhibit after the witness had finished reading it.

Following the testimony of Jennie Woodward, the defense rested. The [petitioner] did not testify.

Robertson, 130 S.W.3d at 844-52 (footnotes omitted).

We will review the claims of the petitioner that he is entitled to a new trial because he has "newly discovered evidence" that the FBI is no longer providing CBLA testimony, which was provided by Agent Peters at the trial.

## ANALYSIS

Following his unsuccessful direct appeal, the petitioner sought post-conviction relief claiming, as one of the bases, "that [the petitioner] received the ineffective assistance of counsel because [c]ounsel failed to challenge expert testimony about the results of a Comparative Bullet Lead Analysis ('CBLA') performed on evidence gathered by law enforcement." Jeffrey Wayne Robertson, 2009 WL 277073, at *9.

At the subsequent evidentiary hearing on the petition for post-conviction relief, trial counsel explained why he had not challenged the CBLA evidence:

Counsel testified that at the time of trial he did not doubt the reliability of the State's CBLA analysis because his research revealed it was a "reliable,

-12-

accepted, [and] scientific way" to determine samples' similarity. He acknowledged the analysis had been "fully discredited" since the time of trial but emphasized he could not have foreseen its discrediting.

Id. at *11.

On appeal from the denial of post-conviction relief, this court, while citing recent cases from New Jersey, Kentucky, and Maryland which concluded that CBLA testimony had been erroneously admitted during the respective trials, explained why admission of such testimony did not entitle the petitioner to a new trial:

Since the Petitioner's conviction and the FBI's disclosure of the misleading nature of its agents' CBLA testimony, at least three cases have been reversed in sister jurisdictions.

. . . .

. . . Since the Petitioner's trial, the FBI has repudiated its agents' CBLA testimony. As a result, we now know that Peters' testimony about the CBLA analysis performed in the Petitioner's case may have been overstated and misleading. During the Petitioner's trial, however, Counsel did not have the benefit of the FBI's retraction. The flaws in Peters' testimony came to light well after Counsel was confronted with the decision of whether to request a jury-out hearing. He did not know, and, in our view, could not reasonably have anticipated that CBLA would be discredited. Therefore, reviewing Counsel's decision in light of his perspective at trial, we conclude Counsel reasonably chose to forego a jury-out hearing. Counsel's assistance was effective. The post-conviction court properly declined to grant post-conviction relief based on Counsel's choice to not request a jury-out hearing on Peters' testimony.

Id. at *16-17.

Relying on a claim similar to that in his post-conviction petition, the petitioner next sought coram nobis relief, arguing that a 2008 letter, from the FBI to the State, which in turn provided a copy to trial counsel, that the FBI was no longer providing CBLA testimony was "newly discovered evidence," entitling him to a retrial.

The record on appeal does not contain a copy of the letter from the FBI regarding the CBLA analysis in this matter. Thus, for the procedural background of this matter, we will

-13-

rely upon the explanation of the State, provided without objection, at the beginning of the evidentiary hearing on the coram nobis petition:

> This case arose out of an incident in which the victim, Ms. Carol Patterson, was discovered on July the 16th, 1996, deceased in her home. Investigation ensued. And on 12/9/1998, the [petitioner], Mr. Jeffery Wayne Robertson, was convicted in Lawrence County Circuit Court, first degree murder. He received a life sentence. At the time of the trial an expert testified from the FBI, an Agent Peters, with regard to comparative bullet-lead analysis testing. There was an objection made at trial, by trial counsel, to the presentation of that testimony. It was overruled at that time and he was allowed to testify.
>
> On December 30th of 1998, a . . . hearing on motion for a new trial was held. That motion was denied. Again, one of the grounds raised in the motion for a new trial was this issue of the reliability of comparative bullet-lead analysis testing. Motion for a new trial overruled. Case goes up on appeal. On April 17th, 2003, the appeal was denied by the Tennessee Court of Criminal Appeals. On October 27th, 2003, cert was denied by the Tennessee Supreme Court.
>
> On November the 3rd, 2003, the [petitioner] filed a [p]ro se petition for post-conviction relief, again, challenging this comparative bullet-lead analysis testing, on the grounds of ineffective assistance of counsel.
>
> In September of 2005, the FBI suspended its use of testing on this comparative bullet-lead analysis testing. Post-conviction had already been heard at that point, but was pending on appeal.
>
> In May of 2007, post-conviction relief hearing was held but . . . no issue was raised with regard to the suspended testing, but comparative bullet-lead analysis was again, as one of the subjects raised in the PCR. Post-conviction was denied. Post-conviction relief was denied on June the 5th, 2007. An appeal was filed on June the 11th of 2007.
>
> On November 28, 2007, while the PCR decision was under appeal, the FBI person contacted District Attorney General Mike Bottoms, regarding . . . the issue of comparative bullet-lead analysis testing. The letter stated that the FBI discontinued the use of this testing in 2005, and requested the transcript of Agent Peters' testimony for review.

On December the 21st of 2007, a transcript of only Agent Peters' testimony – not the entire trial testimony, but only Agent Peters' testimony from the trial was forwarded to the FBI.

In May of 2008, a letter from a Melissa Anne Smrz, who's the acting director of the laboratory for the FBI at that time, sent a letter back to General Bottoms, opining about the impact of Agent Peters' testimony at the trial.

In June of 2008, the [petitioner] filed a [p]ro se petition for a writ of error coram nobis.

Apparently, the State provided of copy of the May 2008 letter from the FBI to the petitioner or his counsel, resulting in the filing of a coram nobis petition. At the evidentiary hearing on the petition, Dr. Marc Lebeau testified that he was the senior forensic scientist of the Scientific Analysis Section of the FBI Laboratory. He said that, in 2003, because of challenges to CBLA testimony, the FBI had asked the National Academy of Sciences "to do a review of this particular discipline and make recommendations on [sic] if there was anything we could do to improve it." He said that they received the Academy's report in 2004 and decided to suspend CBLA testing until all of the recommendations of the report had been addressed. Dr. Lebeau said that, as a result of this review, including the fact that "the media proclaimed that [CBLA] was junk science," such testing became "almost a tainted forensic discipline." He added that the Academy's report had neither said that the FBI should suspend such testing nor that it was "junk science." However, in 2005, the FBI decided to end CBLA analyses. In 2007, the FBI was advised that the Washington Post newspaper and the television show "60 Minutes" was going to do a series on the 2005 notifications of the FBI to past contributors of CBLA samples. The FBI again responded, as it had in 2005, that CBLA was not junk science and that it stood behind such testing. However, they decided to review all cases in which CBLA testimony had been provided.

Dr. Lebeau said that the petitioner's case was one of approximately fifty which the Washington Post had identified where the FBI had provided CBLA testimony. He explained that Agent Peters' testimony was "flagged that as may be a problem" when he said that "it would really take a lifetime" if a bullet were brought to him and he tried to find another one, among the "billions of bullets produced every year," which was a compositional match. However, he said that Agent Peters had later properly clarified that statement, by testifying:

"If I knew it was Federal that narrows it down a little bit because, then, instead of analyzing all the other ammunition out there, I could concentrate on Federal. If I knew it was Federal and was manufactured on a particular date, I would go out searching in everybody's homes, and everything, for that lot number. And

-15-

if I found that lot number on a box, made on that date, I could find that composition."

Dr. Lebeau explained that, had Agent Peters' testimony been reviewed later in the matter, the testimony "probably would not have been flagged as an error." He concluded his testimony by opining that CBLA was "not junk science."

In its order denying the petition, the coram nobis court concluded:

> Based upon a consideration of the proof at this hearing and the evidence at trial, this Court finds that no reasonable basis exists for concluding that had the evidence been presented at trial, or in this case, not presented at trial, the result of the proceedings might have been different. The Court holds that the presentation of CBLA evidence was discussed and argued at the time of trial and at all proceedings since that time. It is not newly discovered. The only new evidence presented is proof of a review of testimony and policy by the FBI. No error was found in the testimony of Agent Peters, nor is there a reasonable basis to believe that the jury was mis[led] by his statements. Given the substantial amount of other evidence of the [petitioner's] guilt, this Court finds no basis to grant [the] [p]etitioner relief.

A writ of error coram nobis is an extraordinary remedy by which the court may provide relief from a judgment under only narrow and limited circumstances. State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999). Tennessee Code Annotated section 40-26-105 provides this remedy to criminal defendants:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial. The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Tenn. Code Ann. § 40-26-105(b), (c) (2012).

The decision to grant or deny a petition for writ of error coram nobis based on newly discovered evidence lies within the sound discretion of the trial court. See Tenn. Code Ann. § 40-26-105; State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995). We review this

-16-

issue, therefore, under an abuse of discretion standard.

As we will explain, we agree with the conclusions of the coram nobis court that the petitioner's claim must fail both because "newly discovered" evidence was not presented and there was a "substantial amount of other evidence of the [petitioner's] guilt," meaning that there was no reasonable basis to conclude that the trial result might have been different had the CBLA evidence been excluded.

In the direct appeal affirming the petitioner's conviction, this court concluded that the evidence was sufficient to sustain his conviction:

[T]he proof [at trial] taken in the light most favorable to the State established that the [petitioner] both had the opportunity to kill the victim and had made numerous statements just prior to the killing of his intent or willingness to do so. The victim was killed during a period between late Monday afternoon and early Tuesday morning. Leon Jennings testified that he had suggested the [petitioner] watch the victim's house to find out if she was seeing another man on Sundays or Mondays, the days the [petitioner] was not allowed to come by, the [petitioner] telling him that "[h]e was afraid that if he seen somebody over [at the victim's house], he might hurt her." Sherry Sherrill, the victim's daughter, testified that four days before the victim's body was discovered, the victim and the [petitioner] argued; and, as a man in a Volkswagen waved at her mother, the [petitioner] said, "If I couldn't have you, nobody else would." Spring Maldonado, who witnessed the same argument, testified that the [petitioner], referring to the man driving the Volkswagen, told the victim if she was "messing around with" him, "he would kill her." The [petitioner] told Spring Maldonado and her sister that he would kill them as well "if [he] f[ou]nd out that you whores [were] trying to get in between [him] and [the victim]." After that argument, the [petitioner] became mad at Richard Eddings for saying that the victim and the [petitioner] broke up because of his drinking and told Eddings, "Well, ain't nobody gonna have her, if I can't have her." The following day, which was the day before the murder, the [petitioner] confronted Jennings and Sherry Sherrill at Houser's Grocery, grabbing Sherrill and raising his hand as if to hit her after she refused to disclose the victim's whereabouts at that time. Stephen Sherrill, the victim's son, said that, four days before the victim's body was found, the [petitioner] had come to their house, argued with the victim, and left "in a rage." The following day, as Sherrill was riding in a car with the victim, the [petitioner] pulled his vehicle in front of theirs and was "very mad," telling the victim as a man passed by driving a Volkswagen, that if he "couldn't have [the victim], nobody else could." The

-17-

next day, which was the day before the victim was killed, the [petitioner] told Stephen Sherrill, referring to the victim, "That bitch would be better off dead," and the [petitioner] grabbed the victim, twisting her arm. Thus, during the several day period before the victim was killed, the [petitioner] made numerous threatening statements as to the circumstances under which he would kill the victim.

There was evidence of the [petitioner's] opportunity to kill the victim. She was last seen alive at approximately 5:00 p.m. on Monday, July 15, 1996, at Houser's Grocery where she purchased a Mountain Dew and left alone in her car, heading toward her house, which was about a quarter of a mile away. A half-full bottle of Mountain Dew was found at the victim's house at the time her body was discovered. The [petitioner's] father testified that his house was about three-quarters of a mile from that of the victim, and said first that the [petitioner] arrived home on foot "about 5:30" p.m. that day, but said later that he had gotten home "between 5:00 and 5:30" that day. His statement to the TBI was that the [petitioner] "came walking up to the house" about 5:30 p.m. Agent Wesson said that the [petitioner's] residence was a twelve- to fifteen-minute walk from the victim's home.

Robertson, 130 S.W.3d at 863-64.

The experiment by Agent Wesson canning green beans on the same stove and in the same manner as the victim showed that her time of death could have been as the petitioner was in the vicinity of her house. Further, the petitioner's description of the crime scene to Travis Paul Maples, that the victim was sitting up with a book in her hand, there was no forced entry into her house, and the assailant entered and exited through the back door, when coupled with the testimony of Agent Wesson and the fact that these details had not been made public, showed that the petitioner possessed information known only to law enforcement officers and the victim's killer.

The coram nobis court did not specifically rule on the State's claim that the petitioner's claim of newly discovered evidence was untimely. It is not necessary for this court to make a determination in this regard either, for it is clear that this petition presents nothing new, other than the letter from the FBI announcing a change in its policy regarding CBLA testimony. Given the strength of the evidence, even if the CBLA testimony had not been given, the coram nobis court properly concluded that there is no reasonable basis to believe that the results of the trial might have been different. The record supports this determination.

-18-

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the dismissal of the petition for writ of error coram nobis.

_____
ALAN E. GLENN, JUDGE